[No. S054291. May 17, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
ERIC ROYCE LEONARD, Defendant and Appellant.

## COUNSEL

Wesley A. Van Winkle, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Mary Jo Graves, Assistant Attorneys General, Ward A. Campbell and Patrick J. Whalen, Deputy Attorneys General, for Plaintiff and Respondent.

Erickson Beasley Hewitt & Wilson and Todd Boley for California Department of Developmental Services as Amicus Curiae, upon request of the Supreme Court.

## OPINION

**KENNARD, J.**—A jury convicted defendant Eric Royce Leonard of six counts of murder (Pen. Code, § 187),[1] and it found true two special circumstance allegations of robbery murder (§ 190.2, subd. (a)(17)) as well as one special circumstance allegation of multiple murder (§ 190.2, subd. (a)(3)). The jury also convicted defendant of two counts of robbery (§ 211), and it found that he had personally used a dangerous or deadly weapon in the commission of each offense (§ 12022.5, subd. (a)). At the penalty phase, the jury returned a verdict of death. Defendant's appeal to this court is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

### I. FACTS

#### A. *Guilt Phase—Prosecution's Case*

At 11:30 p.m. on the night of February 12, 1991, California Highway Patrol Officers James Young and Barry Hoover went to a Quik Stop convenience store on Auburn Boulevard in Sacramento. Young bought a pack of gum and spoke for a few minutes to the clerk, Zeid Obeid. At roughly the

---

[1] Unless otherwise stated, all further statutory references are to the Penal Code.

same time, Sallie Jane Thomas drove her fiancé, Stephen Anderson, to his new job as a clerk at Quik Stop. She saw a young White male wearing a black trenchcoat, black slacks, and black shoes, walking down the street about a block from the store. Thomas dropped Anderson off at Quik Stop and returned home.

About 15 minutes thereafter, Lester Morris arrived at Quik Stop and saw a man lying on the pavement in the parking lot, near the front door of the store, with blood on his stomach. Morris felt the man's pulse, realized he was still alive, and ran into the store seeking help. There he found two men lying on the floor in pools of blood. Morris, who was deaf and had impaired speech, tried to call 911 from a pay phone but he could not make himself understood. A pickup truck pulled into the parking lot soon after, and the driver, Joshua Reed, made the call for him.

Highway Patrol Officers Young and Hoover, summoned back to the scene, found store clerks Anderson and Obeid lying near two open cash registers. Anderson was dead. Obeid, who was unconscious, was taken to the hospital, as was the man found lying outside the store, who was identified as Thor Johnson. Both men later died without regaining consciousness. Anderson and Obeid had each been shot twice in the head, once from more than 18 inches away and once at very close range (less than two inches). Johnson had been shot once in the back of the head at a distance of greater than 18 inches.

Sacramento County Sheriff's deputies found three expended shell casings inside the Quik Stop store. A fourth casing was found just outside the store, and a store employee later found a fifth casing inside the store. Five bullets were recovered from the bodies of the victims. Both the shell casings and the bullets were .25-caliber ammunition. The currency had been removed from both of the store's cash registers, leaving only food stamps and coins. The deputies found a box of shredded beef jerky, several lids to plastic jerky containers, and a bottle of grapefruit juice on top of an ice cream cabinet inside the store; they also found additional beef jerky containers as well as several pieces of jerky on the pavement outside the rear of the store.

At 9:00 p.m. on February 19, 1991, one week after the Quik Stop murders, John Connolly ordered and paid for a small pizza from the Round Table Pizza restaurant at the Country Club Center in Sacramento, six blocks from the Quik Stop store. He then went to the Glacier Lounge, a nearby bar, planning to pick up the pizza later. At 10:50 that night, Alexander Ting, a 17-year-old high school student, rode his bicycle to a market at the Country Club Center. After parking his bicycle, he walked in front of the Round Table Pizza restaurant, where he saw a man in a dark trenchcoat standing at the front counter. Ting bought a soda and ice cream at the market and returned to his

bicycle about 10 minutes later. The man in the trenchcoat was standing on the sidewalk in front of the restaurant, looking from side to side.

At 11:08 p.m., John Connolly returned to the Round Table Pizza restaurant for his pizza. He found the door open and the restaurant apparently empty. Connolly called out that he had returned for his pizza. When nobody answered, Connolly (a regular customer) took his pizza from the oven and left.

At approximately 11:00 p.m. that same night, Andrew Keogh, the assistant manager of another Round Table Pizza restaurant, telephoned the Round Table Pizza restaurant at the Country Club Center. When no one answered, he asked employee Renee Bennett to make several additional calls between 11:05 and 11:20. When there was still no answer, Keogh asked Bennett to drive to the restaurant at the Country Club Center to make sure everything was all right. When Bennett arrived there, the door was open, although the restaurant should have closed at 11:00. In the scullery, she found the three restaurant employees lying motionless on the floor in pools of what appeared to be blood. She called Keogh. He drove over to the restaurant and immediately called 911.

Sheriff's deputies and paramedics arrived within minutes. They determined that two of the employees—Sarah Crook and Kyle Reynolds—were dead. The third employee, Andrea Coladangelo, was taken to a hospital, where she died without regaining consciousness. Each victim had been repeatedly shot in the head—Crook twice; Reynolds and Coladangelo three times each. Two of the restaurant's three cash registers had been emptied. Eight cartridge casings and five expended bullets were found at the scene, and two others were retrieved from the victims' bodies. All were .25-caliber ammunition.

The Sacramento County Sheriff's Department mounted a massive manhunt for the killer, interviewing hundreds of people. One of the persons they spoke to was defendant, who lived near the two crime scenes. He was interviewed at the sheriff's department after he was spotted, two days after the Round Table killings, walking down a street not far from the Quik Stop store at night and wearing a trenchcoat. Defendant told Sheriff's Deputy Robert Bell that he had been at Quik Stop on the night the murders were committed there, but he did not arrive until after the sheriff's barricades were set up. He also said he went to the Country Club Center early on the evening of the Round Table murders, but did not enter the restaurant. Because defendant was quiet, timid, frightened, and confused, and he appeared to be mentally disabled as a result of epilepsy, Bell wrote in his report that defendant was not a likely suspect. Bell did, however, take defendant's photograph.

In May 1991, three months after the murders, sheriff's deputies, still searching for the killer, interviewed Charlotte Henstra and Shane Whitcomb. Henstra worked at a small grocery one block from the Quik Stop store. She said that on the night of the Quik Stop murders, a young man in a trenchcoat and black dress shoes with tassels had come into her store and stayed for approximately 45 minutes, leaving about 10:00 p.m. That same night, between 9:45 and 10:00, Whitcomb, who worked at an office complex near the Quik Stop, saw a man in a trenchcoat and Italian loafers with tassels, who appeared to have come through a hole in a fence next to the office's parking lot. When Whitcomb asked the man for a cigarette lighter, the man made a strange grunting noise and kept walking.

On June 4, 1991, with the investigation at a standstill, Sheriff's Detective Stanley Reed learned of Deputy Bell's February 1991 interview with defendant. Reed and Lieutenant Raymond Biondi found the photograph Bell had taken of defendant and showed it to Charlotte Henstra and Shane Whitcomb. Both said that defendant looked like the person they had seen the night of the Quik Stop murders. Reed and Biondi then showed the photograph to the manager of Zeke's, a gun store located near the two crime scenes, who said he had seen defendant in the store. The next day, Reed and Biondi showed a photographic lineup containing defendant's picture to Sallie Jane Thomas, who had seen a man in a trenchcoat walking near Quik Stop when she had driven her fiancé to work there less than half an hour before the killings. She picked out defendant's photograph as being the "most familiar." They showed the same lineup to Alex Ting, who had seen a man in a trenchcoat outside the Round Table Pizza restaurant on the night the killings occurred there. He picked out defendant's photograph as "a possibility."

On June 6, 1991, Lieutenant Biondi and Detective Reed conducted a videotaped interview with defendant at the sheriff's department. During the interview, which is described in greater detail in part III.B., *post*, defendant admitted that he had bought ammunition from Zeke's. He also telephoned his father, Douglas Leonard, telling him he had put some of that ammunition into his father's ammunition box. He also said that his father's gun used the same kind of bullets as the gun used to commit the murders. After the interview, Biondi and Reed took defendant back to his apartment. There, defendant gave them an ammunition box and a baggie that between them contained 36 .25-caliber cartridges. With defendant's permission, Biondi and Reed also took a trenchcoat and two pairs of shoes, one of which was a pair of dark dress shoes with tassels.

Leaving defendant at his apartment, Lieutenant Biondi and Detective Reed then went to his father's home and obtained his .25-caliber Beretta pistol and a box containing cartridges. Ballistics tests conducted that afternoon determined that the pistol had fired the bullets and casings found in the victims'

bodies and at the crime scenes. After learning this information, Biondi and Reed returned to the home of defendant's father, where defendant had gone, and arrested him. When Detective Reed told defendant's father that his gun was the murder weapon, the father's eyes teared up and he said: "I know, he told me that he did it. I can't believe he did it. I asked him why . . . He said stress. . . . I can't believe he did it, he killed six people." (At trial, defendant's father denied that defendant had confessed to him, and his statement to Detective Reed was admitted as a prior inconsistent statement.)

Lieutenant Biondi and Detective Reed took defendant to the sheriff's department and handcuffed him to a table in an interview room. Defendant's father came to the station and asked to speak to defendant. Biondi and Reed permitted this, but they videotaped the conversation, which lasted 20 minutes. The father repeatedly asked defendant whether anyone else was involved in the crimes, and defendant repeatedly said no one else was involved.

In a lineup conducted after defendant's arrest, Sallie Jane Thomas identified defendant as the person she had seen walking near the Quik Stop store on the night of February 12, 1991, and Alexander Ting identified defendant as the person he had seen outside the Round Table restaurant on the night of February 19, 1991. (They also later identified him at trial.) During a search of defendant's apartment after his arrest, sheriff's deputies seized a jar of beef jerky and an empty wooden crate with the word "jerky" printed on it.

In September 1994, during pretrial proceedings on a motion for a change of venue, defendant raised his hand to speak and announced: "I am guilty."

### B. *Guilt Phase—Defense Case*

The defense argued that defendant was physically incapable of committing the murders because of severe mental and physical impairments that resulted from his uncontrolled epilepsy.

Dr. Robert Pavy, a neurologist, explained at trial that defendant has epilepsy that affects both of his temporal lobes and that may have resulted from meningitis he suffered as a child. He has frequent complex partial seizures that cannot be prevented by surgery or medication and that affect his personality. Each seizure defendant experiences magnifies the damage to his brain. He is unable to work or drive a car.

According to Dr. Pavy, if defendant had a seizure shortly before his brief encounter with Shane Whitcomb, he could not have committed the robbery and the murders at the Quik Stop two hours later. Pavy explained that the crimes required complex planning that defendant could not have performed

until his brain's recovery from the seizure, which would have taken several hours. He said that a man who suffers from complex partial seizures that are not controlled by medication would be incapable of going into a store, committing a robbery, and shooting three people in the head without missing, because such a robbery would cause the man to suffer anxiety, which in turn would bring on a seizure.

Virginia Furlong, who worked at the California Department of Rehabilitation, testified that an intelligence quotient (IQ) test administered two years before the murders showed that defendant had a verbal IQ of 75, a performance IQ of 86, and a full-scale IQ of 78. Dr. William Lynch, a neuropsychologist, testified that an IQ test conducted after defendant's arrest showed his verbal IQ as 75, his performance IQ was 94, and his full-scale IQ was 80. Dr. Lynch explained that defendant's full-scale IQ placed him in the ninth percentile of the population, and that the wide disparity between his verbal IQ and his performance IQ indicated the presence of brain damage. Based on other tests, Dr. Lynch concluded that defendant has "mild to moderate" brain damage.

Dr. John Thornton, a forensic scientist, reviewed the reports of the crime scenes, but he concluded there was insufficient physical evidence to permit a detailed reconstruction of the crimes, including the order in which the victims were shot and the relative positions of the killer and the victims. He testified that the gun used in the killings was not particularly accurate, and that the killer displayed remarkable accuracy because all of the shots hit the victims in the head and there was no evidence of misses or wild shots. He said that if the killer had been wearing defendant's trenchcoat, gloves, and shoes, he would have expected to find blood on those items, and none was found.

Virl Dunn testified that defendant became a friend of his son Antoine in the sixth grade, and that defendant lived at Dunn's house during his senior year in high school and the next year. He said defendant had three to four epileptic seizures a week, and he described the seizures as well as the fatigue defendant experienced in their wake. He mentioned that defendant had continuous mild tremors (the defense theory was that this would have made it difficult for him to shoot accurately), and that defendant had difficulty planning and making quick decisions. Agnes Dunn, Virl's wife, corroborated his testimony. Their son, Antoine Dunn, testified that he and defendant occasionally practiced target shooting with BB guns and a pellet rifle, and that once on a camping trip they took turns firing two guns owned by a friend. He described defendant as a very poor marksman who was "[t]otally uncoordinated" and did not improve with practice.

C. *Penalty Phase—Prosecution's Case*

The prosecution called six witnesses to present victim impact evidence. They briefly outlined the life histories of the victims and described the devastating impact of the murders on the witnesses themselves and on other family members.

Mark Hariri testified that his cousin, victim Zeid Obeid, emigrated from Kuwait. He initially worked at Quik Stop but quit after the store was robbed. When he later decided to return to work there Hariri told him angrily over the telephone that he should not take the job because it was dangerous. Hariri hung up after saying he hoped something bad would happen to Obeid. When Obeid was murdered a few days later, Hariri experienced great guilt and underwent therapy. The Kuwaiti government refused to allow Obeid's body to be returned to Kuwait, where his parents lived, for burial because he was a Lebanese citizen, although he had spent most of his life in Kuwait. After a delay of three months, his body was shipped to Lebanon, where he was buried.

Aaron Johnson, the teenage son of victim Thor Johnson, testified that his father "was always there for us," and expressed sadness that his father would be unable to see him graduate from high school or to attend the wedding of Aaron's brother.

Sallie Jane Thomas, Stephen Anderson's fiancée, testified that she was four months pregnant with Anderson's child when he was murdered. Since the murder, she had been taking antidepressant medication. She said Anderson's family was devastated by his death.

Kimberly Nabours, the sister of murder victim Sarah Crook, testified that Crook was a student at American River College in Sacramento at the time of her death. Since Crook's death, Nabours had begun to use drugs, and the loss "affected [her] mother to such a degree that she ultimately lost her house."

Donna Coladangelo, mother of murder victim Andrea Coladangelo, testified that Andrea had moved from Ohio to California to start a new life. The family learned of Andrea's death by a telephone call at 4:30 a.m., and four years later, she and her husband would still wake up every morning at that time. Andrea's four brothers all had difficulty coping with her death, and Andrea's father was afraid to be alone.

Judith Reynolds, mother of victim Kyle Reynolds, testified that Kyle had just turned 20 when he was murdered and that he was attending Sierra Junior

College. She and her family were crushed by Kyle's death, which left a "void . . . that nothing can fill."

### D. *Penalty Phase—Defense Case*

The defense called various family members, teachers, psychologists and psychiatrists to present an extensive social and psychiatric history of defendant.

Defendant's father was an alcoholic who physically abused defendant's mother, and the couple separated shortly after defendant's birth. Defendant had a seizure when he was eight months old, when he had a high fever and possibly meningitis, and he had another seizure, again brought on by a high fever, about four months later. When he was four years old, he was diagnosed as epileptic after having a third seizure that was not caused by fever. He was treated with Dilantin, which controlled the seizures but left him "slowed down" mentally. His second grade teacher believed he had a learning disability, and in fourth grade he was placed in a special education class.

In the fifth grade, defendant's doctor took him off Dilantin, which caused him to become more alert, but six months later his seizures returned. He was prescribed several medications, which reduced the frequency of his seizures but did not prevent them from occurring. About this time, defendant's mother became involved with Richard Bullock, a heavy drinker who disliked children. Defendant's mother began drinking more heavily. When she married Bullock, defendant went to live with his father, with whom he had little previous involvement. Bullock and defendant's mother moved to a small town in Missouri and bought a tavern. After living with his father for two years, defendant called his mother and asked to live with her, saying his father beat him.

Defendant joined his mother and stepfather in Missouri, where he lived for two years, but after the stepfather's son moved out, defendant became lonely and returned to California, where he became very fat. He first lived with his father and later with the Dunn family. He graduated from high school in June of 1988. The next year he moved into his own apartment. In 1990, he enrolled in classes at a junior college and began losing weight rapidly. In January of 1991 he was arrested for stealing a bathroom scale. He pled guilty to this crime on February 11, 1991, the day before committing the murders at Quik Stop.

Julie Sidwell, a special education teacher at a junior college, first met defendant when he was 17 years old. She helped him apply for supplemental security income (SSI) and subsidized housing. She said that defendant, who

was very immature, was determined to lead a normal life—to live on his own and go to college—but he did not understand that these goals were unrealistic because of his disability. He would study for hours but then have a seizure that caused him to forget everything he had learned.

According to Carl Curtis, an expert in forensic accounting who examined defendant's checkbook and checking account, defendant managed his money reasonably well from June 1988, when he graduated from high school and began receiving SSI checks, until the fall of 1989. He then moved out of the Dunn family's home and into a small apartment, which he could not afford on his SSI payments of $630 per month. He exhausted his savings in January 1991, a month before the murders, and he began writing overdraft checks to meet his expenses. In February 1991, the month he committed the six murders, he spent $29.60 (approximately a dollar a day) on food.

Dr. Peter Valk, an expert in positron emission tomography (PET) scans, testified that he performed a PET scan of defendant's brain, which showed a significant abnormality in the left temporal lobe and a lesser degree of impairment in the right lobe. Dr. Bruce Reed, a neuropsychologist, agreed with Dr. Valk's testimony. Based on the PET scan and on defendant's medical history, Dr. Reed concluded that not only defendant's temporal lobes were damaged, but also his limbic system, which includes his amygdalae and hippocampi, parts of the brain that affect emotions and control basic urges such as fear and aggression.

Dr. Alfred Fricke, a psychologist, diagnosed defendant as psychotic, with organic brain damage and a schizoid personality disorder. He testified that defendant suffered from very basic cognitive impairments, such as his inability to figure out in which direction the sun rose in the morning and to determine his location on a map. Defendant expressed to him remorse for the killings, and said he did not deserve to live. Defendant described the killings to Dr. Fricke in a very detached manner, as if he was watching them on television.

Dr. Maxine Junge, an expert in art therapy, testified that defendant's artwork showed him to be severely and chronically depressed.

According to Dr. Timen Cermak, a psychiatrist, the serious damage to defendant's amygdalae and temporal lobes—parts of the brain that are essential for normal personality development—caused him to develop a schizoid-schizotypal personality, characteristics of which include social detachment, flat emotions, inability to perceive the moods and needs of others, magical thinking, and eccentric behavior. Dr. Cermak explained that because of defendant's serious disorder, he needed more attention than the average

child while growing up, but that he actually received less because of the inadequacies of defendant's parents.

According to Dr. Cermak, when defendant became an adult he should have been placed in a structured setting such as a therapeutic board and care facility. Instead, he was left on his own, and his inability to manage his finances, perhaps abetted by hormonal changes resulting from his drastic loss of weight, caused him to decompensate into a psychotic state. He began stealing food and small items from neighborhood stores, which resulted in his arrest and conviction for shoplifting. The day after his conviction, angered by his belief that other shoplifters he had seen in court were given preferential treatment, he went into the Quik Stop store to steal beef jerky and committed the three murders there.

A minister at the Sacramento County Jail and two county jail inmates testified that defendant actively participated in Bible study classes while he was in custody before and during the trial, that his religious beliefs seemed sincere, that he was a positive influence on other inmates, and that he had expressed remorse for the murders.

A retired administrator who had worked at the California Department of Corrections for 30 years described the conditions experienced by inmates sentenced to life imprisonment without possibility of parole, and said that if defendant received such a sentence he would adjust well in prison.

## II. COMPETENCY ISSUES

After defendant unexpectedly announced in open court, "I am guilty," the defense asked Dr. George Wilkinson, a psychiatrist, to evaluate his competence to stand trial. In Dr. Wilkinson's view, defendant suffered from "a delusion: 'a Christian path to speak the truth whenever the Holy Spirit touches' " him, that had "more strength, validity and urgency than his rational understanding of the proceedings." He concluded that defendant was incompetent to stand trial because he could not cooperate with his attorneys as a result of "a Psychotic Disorder with Delusions due to Chronic Severe Epilepsy." Based on Dr. Wilkinson's findings, the trial court declared a doubt as to defendant's competence to stand trial. It appointed two psychiatrists, Dr. Kourosh Lashi and Dr. Charles Schaffer, to examine defendant. Both sides waived a jury, and the question of competence was decided at a court trial.

At the court trial, Drs. Lashi and Schaffer both testified that the competency determination was difficult because of defendant's low intelligence, his seizure disorder, and his mental impairment. They agreed that defendant had

become intensely religious while awaiting trial, and that he was not malingering or faking his symptoms. But they disagreed as to whether defendant's claimed observations of demons and angels showed that he was delusional and unable to cooperate with his attorneys.

Dr. Lashi explained that defendant's seizure disorder is known to sometimes cause "hyper-religiosity." In Dr. Lashi's view, defendant suffered not only from a seizure disorder but also from an unspecified psychosis. These caused him to experience religiously oriented delusions that made it impossible to cooperate with his attorneys. Defendant told Dr. Lashi he observed angels and demons and that he saw ghosts in the courtroom. Dr. Lashi concluded that defendant believed "he received signs from God that tell[] him how to behave . . . in court," and these signs "supersede whatever his lawyers would recommend him to do."

Dr. Schaffer, on the other hand, testified that defendant was competent to stand trial. His findings are also described in his 38-page, single-spaced written evaluation, which was admitted as an exhibit at the competency trial.

Dr. Schaffer viewed defendant as suffering from possible bipolar disorder, possible schizophrenia, cannabis abuse in remission, a learning disorder, and a complex partial seizure disorder. Defendant told him that he had announced his guilt in court because "[t]he spirit of God had influenced him, and he wanted to accept the spirit of God and go to heaven." Dr. Schaffer expressed uncertainty with regard to whether defendant's deep religious beliefs "were of delusional proportions as opposed to strong non-psychotic feelings about religion." He acknowledged that defendant had difficulty responding to his questions: Some of defendant's sentences were disjointed and had no subject at the beginning, and he sometimes engaged in the tangential reasoning typical of those suffering from schizophrenia. But Dr. Schaffer concluded that defendant had "a marginal, but adequate understanding of the nature of the current legal proceeding and of the legal process in general," and he had "a positive relationship with his attorney."

The defense called as an expert witness Dr. William Lynch, a neuropsychologist and the director of the brain injury rehabilitation unit for the Veterans Health Administration hospital in Menlo Park. Based on a series of tests he administered to defendant, Dr. Lynch described that defendant as having "mild to moderate neuropsychological impairment," poor verbal memory, and problems with reading, spelling, and general verbal expression. The tests showed no "clear indication" of "an acute, major psychosis," but he diagnosed defendant as having a schizoid personality, which he described as "not necessarily a person who is completely out of touch with reality . . . and grossly delusional and all that," but rather a person "off center." His tests

revealed no evidence of delusions. Dr. Lynch did not say whether he believed defendant was competent to stand trial.

The defense also called as a witness Paula Thomas, defendant's mother. She testified that defendant had a seizure disorder that she first observed when he was four years old. The disorder was initially controlled by medication, but as defendant grew older the drugs were no longer able to prevent him from having seizures. When he was six years old, defendant said he saw spirits, but at the time she considered it simply a childish fantasy. When he was 19 years old, he again told her he was hearing voices. Defendant did not attend church as a child, but since his arrest religion had become "all consuming."

Another defense witness, Michael Singer, a social worker who worked at the Sacramento County Jail, said that while awaiting trial defendant had complained of hearing voices, and said he was unsure whether the voices were in his head, outside his cell, or in the plumbing.

Carolyn Lange, defendant's lead counsel, testified that defendant had been cooperative with her before his sudden declaration of guilt in court, that he had begun carrying a Bible with him, and that he had sent her religious artwork. She said her view about his ability to cooperate with her "changed drastically" as a result of defendant's interview with Dr. Wilkinson in the wake of his outburst.

The trial court found defendant competent to stand trial. It acknowledged that defendant was suffering from a thought disorder and that he was not faking his symptoms, but it was persuaded by Dr. Schaffer's report that defendant was nonetheless competent.

A. *Trial Court's Failure to Appoint the Regional Director for the Developmentally Disabled to Examine Defendant*

When the trial court declared a doubt as to defendant's competence to stand trial, it appointed two psychiatrists to examine him. But it did not appoint the director of the regional center for the developmentally disabled to examine defendant, although it was aware that he suffered from epilepsy. Defendant contends that the court's failure to do so is a jurisdictional error requiring reversal of his convictions and death sentence.

Subdivision (a) of section 1369 describes the procedures to be followed when a trial court declares a doubt as to a defendant's competence to stand trial: "The court shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant. . . . *If*

*it is suspected the defendant is developmentally disabled, the court shall appoint the director of the regional center for the developmentally disabled . . . to examine the defendant.* The court may order the developmentally disabled defendant to be confined for examination in a residential facility or state hospital. [¶] The regional center director shall recommend to the court a suitable residential facility or state hospital. Prior to issuing an order pursuant to this section, the court shall consider the recommendation of the regional center director. While the person is confined pursuant to order of the court under this section, he or she shall be provided with necessary care and treatment." (Italics added.) And at the time of defendant's trial, former subdivision (a)(1) (now subd. (a)(1)(H)) of section 1370.1 provided: " '[D]evelopmental disability' means a disability that originates before an individual attains age 18, continues, or can be expected to continue, indefinitely and constitutes a substantial handicap for such individual . . . . [T]his term shall include mental retardation, cerebral palsy, *epilepsy*, and autism." (Italics added.)

Defendant suffers from epilepsy, a disability that originated well before his 18th birthday, is expected to continue indefinitely, and has constituted a substantial handicap for him. Thus, his epilepsy falls within the definition of "developmental disability" in section 1370.1, and the trial court erred when it did not appoint the director of the regional center for the developmentally disabled to examine him as part of the competency proceedings, as required by section 1369.

In contending that the trial court's noncompliance with section 1369 requires reversal, defendant relies on *People v. Castro* (2000) 78 Cal.App.4th 1402 [93 Cal.Rptr.2d 770] (*Castro*). In *Castro*, the defendant was charged with child abuse and murder of her infant child. After a court-appointed psychiatrist reported that the defendant was developmentally disabled, the trial court suspended proceedings to determine her competence, but it refused to appoint the director of the regional center to examine her, and instead appointed a psychiatrist to perform that task. The psychiatrist concluded that the defendant had no psychiatric disease but suffered from an unspecified learning disability. Based on this report the trial court found the defendant competent. Later court proceedings revealed that the defendant was mentally retarded, with an IQ of 61 and the intelligence of a six-to-seven-year-old child.

The Court of Appeal in *Castro* held that the trial court exceeded its jurisdiction when it failed to appoint the director of the regional center to examine the defendant, and that this failure required reversal of her conviction for second degree murder. The court explained: "When the relevant statutes set forth a specific procedure to be followed in determining whether a

defendant is competent to stand trial, and those procedures have not been adhered to, the fundamental integrity of the court's proceedings have been compromised. Due process *requires* that any doubt regarding the defendant's competency be properly evaluated by experts prior to proceeding with trial." (*Castro, supra,* 78 Cal.App.4th at p. 1419.)

The Attorney General here argues that *Castro, supra,* 78 Cal.App.4th 1402, was wrongly decided and that reversal in this case is not required. As explained below, we conclude that although the *result* in *Castro* may well be correct, *Castro* is wrong to the extent it holds that a trial court's erroneous failure to appoint the director of the regional center to examine a developmentally disabled defendant whose competence is in question is a jurisdictional error that *necessarily* requires reversal of any ensuing conviction.

To determine whether defendant here was prejudiced by the trial court's failure to appoint the director of the regional center to evaluate him because of his developmental disability (§ 1369), we must first consider why the Legislature required the evaluation. The statutory requirement appears to serve three functions.

First, the evaluation assists the trial court in determining where the defendant should be confined pending the competency determination. Subdivision (a) of section 1369 permits the trial court to confine a developmentally disabled defendant "for examination in a residential facility or state hospital." If the court chooses to do so, "[t]he regional center director shall recommend to the court a suitable residential facility or state hospital" and before issuing a confinement order "the court shall consider the recommendation of the regional center director." (*Ibid.*)

Second, the regional director assists the trial court in selecting an appropriate placement for the defendant if the defendant is found incompetent. Subdivision (a)(1)(B)(i) of section 1370.1 provides that if a defendant found to be incompetent is developmentally disabled, criminal proceedings are suspended until the defendant becomes competent, and "the court shall consider a recommendation for placement, which recommendation shall be made to the court by the director of a regional center or designee."

The third purpose of section 1369's requirement of an evaluation by the regional director, and the only one relevant here, is to ensure that a developmentally disabled defendant's competence to stand trial is assessed by those having expertise with such disability. In the words of the California Department of Developmental Services (DDS), the state agency that oversees the regional centers: "A valid assessment of a criminal defendant's ability to stand trial requires a[] comprehensive, individualized examination of the

defendant's ability to function in a court proceeding. A reliable assessment is achieved through thorough examinations of each individual by experts experienced in developmental disabilities."[2] A regional center, the DDS explains, is "the primary agency to provide expert advice relating to the assessment, needs, and abilities of a criminal defendant with developmental disabilities." Court-appointed psychiatrists and psychologists may not have this expertise, because their experience may pertain to mental illness rather than developmental disability. This was the case in *Castro*, where the two psychiatrists who evaluated the defendant's competence made no "attempt to determine [the defendant's] intelligence level or assess the extent of her developmental disability." (*Castro, supra*, 78 Cal.App.4th at p. 1418.)

When a trial court suspends criminal proceedings based on a doubt that a criminal defendant is competent to stand trial, and the court thereafter fails to hold a competency hearing, the trial court "acts in excess of jurisdiction by depriving the defendant of a fair trial" (*People v. Superior Court (Marks)* (1991) 1 Cal.4th 56, 70 [2 Cal.Rptr.2d 389, 820 P.2d 613]), and any ensuing criminal conviction must be set aside (*People v. Marks* (1988) 45 Cal.3d 1335, 1340 [248 Cal.Rptr. 874, 756 P.2d 260]; *People v. Hale* (1988) 44 Cal.3d 531, 541 [244 Cal.Rptr. 114, 749 P.2d 769]). But here, the trial court's error was less egregious: it failed to appoint the director of the regional center for the developmentally disabled to evaluate defendant. Given the three statutory purposes of this evaluation that we have just described, defendant's ensuing murder convictions and death sentence need not be reversed unless the error deprived him of a fair trial to determine his competency. As we explain, the error was harmless.

Unlike *Castro, supra*, 78 Cal.App.4th 1402, the trial court's competency determination was based on evidence from experts who were familiar with defendant's developmental disability and who considered it in evaluating his competence. Dr. Schaffer, the court-appointed psychiatrist who testified that defendant was competent to stand trial, was a professor at the University of California at Davis School of Medicine and a diplomate of the American Board of Psychiatry and Neurology. Even though he did not specialize in epileptic patients, he had observed patients who had seizures similar to those of defendant. Similarly, Dr. Lynch, the neuropsychologist who testified for the defense, had treated many epileptic patients, although his primary area of expertise pertained to head injuries, not epilepsy.

Unlike the court-appointed psychiatrists in *Castro, supra*, 78 Cal.App.4th 1402, neither of whom evaluated the developmental disability of the defendant in that case, Drs. Schaffer, Lynch, and Lashi testified at length about

---

[2] At the request of this court, the DDS has submitted an amicus curiae brief in this case, discussing the application of section 1369 to persons with developmental disabilities.

defendant's developmental disability, epilepsy. In addition, Dr. Schaffer's report extensively discussed defendant's epilepsy, and an appendix to his report listed eight articles in scholarly journals that Dr. Schaffer used as references in preparing his report, all of which dealt with epilepsy.

■ In summary, appointment of the director of the regional center for the developmentally disabled (§ 1369, subd. (a)) is intended to ensure that a developmentally disabled defendant is evaluated by experts experienced in the field, which will enable the trier of fact to make an informed determination of the defendant's competence to stand trial. Here, defendant was evaluated by doctors who possessed these qualifications, and their testimony provided a basis for the trial court's ruling that defendant was competent to stand trial. Thus, the court's failure to appoint the director of the regional center to examine defendant did not prejudice defendant.[3]

■ Defendant asserts that the trial court's failure to appoint the regional director to evaluate him violated his rights under the federal Constitution to due process and a fair trial, as well as his Eighth Amendment right to a reliable guilt and penalty proceeding. Not so. The federal Constitution requires the states to "observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial." (*Drope v. Missouri* (1975) 420 U.S. 162, 172 [43 L.Ed.2d 103, 95 S.Ct. 896].) Here, notwithstanding the trial court's failure to obtain an evaluation from the director of the regional center for the developmentally disabled, defendant's competency trial protected his right not to be tried or convicted while incompetent.

B. *Sufficiency of Evidence of Defendant's Competency*

Defendant argues the evidence was insufficient to support the trial court's ruling that he was competent to stand trial. The court based its ruling on the testimony and report of Dr. Charles Schaffer, one of the two court-appointed psychiatrists, who examined defendant and concluded that defendant was competent. Defendant argues that Dr. Schaffer's testimony was fatally flawed in several respects. For the reasons explained below, we disagree.

Defendant asserts that although Dr. Schaffer concluded that defendant was not incompetent as a result of a *psychiatric disorder*, he never considered whether defendant was incompetent as a result of his *seizure disorder*, which is not a psychiatric disorder but a developmental disability. According to defendant, a competency inquiry under section 1369 involves two distinct

---

[3] We disapprove *People v. Castro, supra*, 78 Cal.App.4th 1402, to the extent it is inconsistent with the views expressed here.

questions: (1) whether the accused is incompetent as a result of a psychiatric disorder, and (2) whether the accused is incompetent as a result of a developmental disability. To the contrary, these are not two separate questions, but one: whether, based on a *combination of all factors*, including both psychiatric disorders and developmental disabilities, the defendant is competent to stand trial.

Defendant bases his argument that Dr. Schaffer considered only his psychiatric disorders on one sentence in Dr. Schaffer's 38-page report: Dr. Schaffer's conclusion that "[t]here is insufficient evidence to conclude that Mr. Leonard is unable to assist his counsel in the conduct of a defense in a rational manner as a result of a psychiatric disorder." But the rest of Dr. Schaffer's report and his testimony at the competency trial demonstrate that Dr. Schaffer considered not only defendant's psychiatric disorder, but also his seizure disorder, when he concluded that defendant was competent.

Defendant contends that Dr. Schaffer based his competency determination on the mistaken belief that defendant was incompetent only if (1) he could not understand the nature of the proceedings *and* (2) he was unable to assist defense counsel in a rational manner, whereas a defendant is incompetent if *either* of these statements are true. (§ 1369.) Although Dr. Schaffer initially misstated the statutory test, in response to cross-examination by defense counsel he corrected himself, thereby demonstrating an accurate understanding of the correct legal standard.

Dr. Schaffer's report stated that defendant was "sufficiently able to understand the nature of the criminal proceedings" and there was "*insufficient evidence to conclude* that [defendant] is unable to assist his counsel in the conduct of a defense in a rational manner . . . ." (Italics added.) Based on the italicized language, defendant claims that Dr. Schaffer never actually decided whether defendant could rationally assist his attorneys. Rather, he asserts, Dr. Schaffer believed defendant had the burden of proving to Dr. Schaffer that he was unable to do so, and Dr. Schaffer found defendant competent because he had not satisfied this burden. As defendant points out, although he had the burden of proving his incompetence to the trier of fact (§ 1369, subd. (f)), he did not have the burden of proving it to Dr. Schaffer.

Dr. Schaffer testified, however, that defendant had told him that he had a "positive relationship" with Defense Attorney Caroline Lang, that he trusted her, that he could communicate with her, and that he considered her a competent attorney. Dr. Schaffer also mentioned that defendant appeared to interact appropriately with his attorneys during the competency hearing itself. Viewing Dr. Schaffer's testimony as a whole, we conclude that he based his

determination that defendant could cooperate with his attorneys on his interview with, and observations of, defendant, not on a misguided view of the burden of proof.

Defendant contends that Dr. Schaffer "really was not sure whether [defendant] was competent" and his "responses on all the most critical questions were completely equivocal." We disagree. Although Dr. Schaffer expressed uncertainty as to whether defendant had experienced religious hallucinations and said it "wasn't easy to try to assess" whether defendant's behavior resulted from a "severe delusional disturbance driven by a psychiatric disorder" or whether he was merely "very religious," he unequivocally expressed his view that defendant "is competent to stand trial."

For all of these reasons, Dr. Schaffer's testimony and report provide substantial evidence supporting the trial court's competency determination.

### C. *Events Occurring After Trial*

Defendant argues that certain events after his trial demonstrate that he was incompetent at the time of trial and remains incompetent today. He asserts that in November 2002 he was transferred from death row to the California Medical Facility at Vacaville and placed on psychotropic medication without his consent after he engaged in bizarre behavior, which included placing his hand in scalding water because he believed Jesus had commanded him to do so, and he relies on testimony at the hearing to involuntarily medicate him as evidence that he was incompetent at the time of trial. On appeal, however, we review the appellate record for error, without considering matters not presented to the trial court. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405 [2 Cal.Rptr.3d 683, 73 P.3d 541].) The testimony cited by defendant might conceivably be relevant in a habeas corpus petition, but we do not consider it on this appeal.

### III. PRETRIAL AND GUILT PHASE ISSUES

### A. *Denial of Motion for Change of Venue*

Defendant contends the trial court erred in denying his motion for change of venue.

"A trial court should grant a change of venue when the defendant demonstrates a reasonable likelihood that in the absence of such relief, he cannot obtain a fair trial." (*People v. Weaver* (2001) 26 Cal.4th 876, 905 [111 Cal.Rptr.2d 2, 29 P.3d 103].) On appeal, we independently examine the record to determine whether a fair trial was obtainable. (*People v. Panah*

(2005) 35 Cal.4th 395, 447 [25 Cal.Rptr.3d 672, 107 P.3d 790].) Both the trial court's initial venue determination and our independent evaluation are based on a consideration of five factors: "(1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and (5) prominence of the victim." (*People v. Sully* (1991) 53 Cal.3d 1195, 1237 [283 Cal.Rptr. 144, 812 P.2d 163]; see also *Panah, supra,* at p. 447.)

Defendant asserts that neither the trial court nor this court should apply this five-factor test here; instead, he argues that the appropriate standard is what he describes as the "presumed prejudice rule." He claims the United States Supreme Court articulated this rule in *Murphy v. Florida* (1975) 421 U.S. 794 [44 L.Ed.2d 589, 95 S.Ct. 2031], when it explained the basis for its holdings in three previous cases in which the high court held that the trial court had erred by denying the defendant's motion for change of venue: *Rideau v. Louisiana* (1963) 373 U.S. 723 [10 L.Ed.2d 663, 83 S.Ct. 1417] (*Rideau*); *Estes v. Texas* (1965) 381 U.S. 532 [14 L.Ed.2d 543, 85 S.Ct. 1628] (*Estes*), and *Sheppard v. Maxwell* (1966) 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507] (*Sheppard*).

In the words of the high court in *Murphy*: "Prejudice was presumed in the circumstances under which the trials in *Rideau, Estes,* and *Sheppard* were held. In those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings. In *Rideau,* the defendant had 'confessed' under police interrogation to the murder of which he stood convicted. A 20-minute film of his confession was broadcast three times by a television station in the community where the crime and the trial took place. In reversing, the Court did not examine the *voir dire* for evidence of actual prejudice because it considered the trial under review 'but a hollow formality'—the real trial had occurred when tens of thousands of people, in a community of 150,000, had seen and heard the defendant admit his guilt before the cameras. [¶] The trial in *Estes* had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment. Similarly, *Sheppard* arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival. The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." (*Murphy v. Florida, supra,* 421 U.S. at pp. 798–799.)

We question defendant's assertion that in *Murphy v. Florida, supra,* 421 U.S. 794, the United States Supreme Court articulated a test for

determining when *a trial court should grant* a motion for change of venue. Rather, *Murphy* appears to describe a standard by which *an appellate court assesses prejudice* when a trial court has erroneously denied a motion for change of venue. That is, it holds that when the influence of the news media has so completely "pervaded the proceedings" (*id.* at p. 799) in a criminal case that the trial is conducted in a "circus atmosphere" (*ibid.*) or becomes a " 'hollow formality' " (*ibid.*), the trial is so fundamentally unfair that the ensuing conviction must be reversed without regard to the strength of the prosecution's case or the prospective jurors' protestations of neutrality during voir dire. For the same reason, we reject the Attorney General's argument that defendant forfeited his right to rely on *Murphy* by not citing it in the trial court: Because *Murphy* articulates a standard for appellate court review, it has little relevance at trial.

In any event, this case does not resemble *Rideau, supra,* 373 U.S. 723, *Estes, supra,* 381 U.S. 532, or *Sheppard, supra,* 384 U.S. 333. Unlike the "circus atmosphere" (*Murphy, supra,* 421 U.S. at p. 799) of the trials in *Estes* and *Sheppard,* here the trial court carefully limited media coverage of the trial. And unlike *Rideau,* where the trial was held in a small community, where many had seen the defendant's televised confession, here the trial was held in a large metropolitan area, and defendant did not make a televised confession. Therefore, the presumption of prejudice does not apply, and we here apply our standard five-part test, described at the beginning of this part, to determine whether there was a reasonable likelihood that, as a result of the pretrial publicity, defendant could not have a fair trial.

As the trial court acknowledged, the first factor—the nature and gravity of the offense—weighed heavily in favor of a change of venue. Defendant was charged with not just one capital murder; he was charged with *six* murders. In short, "[t]he 'nature and gravity' of the present offenses could not have been more serious." (*People v. Ramirez* (2006) 39 Cal.4th 398, 434 [46 Cal.Rptr.3d 677, 139 P.3d 64].)

The second factor pertains to the nature and extent of the media coverage. The media's coverage of the case was sensational and extensive. Early in the investigation a homicide detective described the murders as "thrill killings" committed by a man who "likes to kill," and thereafter the media consistently described the perpetrator, both before and after defendant became a suspect, as the "Thrill Killer," a highly pejorative moniker that was potentially prejudicial to defendant. In his motion to change venue, defendant cited 556 television segments on the killings that appeared on local stations, as well as 130 newspaper articles, most of them in the Sacramento Bee, the area's largest newspaper. Many of the television news segments and newspaper articles were the lead story. As a result, public awareness of the case was very

high: According to two public opinion surveys conducted by the defense, approximately 85 percent of the public had heard of the case. The second survey, conducted after defendant suddenly announced in the courtroom that he was guilty, revealed that more than half of the public were aware of the incident.

But even the survey conducted after defendant's in-court outburst showed that of those familiar with the case, only 22 percent considered him "definitely guilty" while an additional 36 percent believed he was "probably guilty." Thus, much of the community was keeping an open mind on the question of defendant's guilt. The passage of time also reduced the likelihood that the media reports would prejudice defendant: Most of the stories appeared in 1991 (when the crimes were committed and defendant was arrested), four years before defendant's trial. Furthermore, the media did not mention any significant facts that would be inadmissible at trial, such as a criminal record or evidence obtained in an illegal search or interrogation. For these reasons, we agree with the trial court that "[w]hile the extent of publicity and its nature are in favor of a change of venue . . . proper voir dire can overcome the potential prejudice."

The third factor—size of the community—weighed against a change of venue. Sacramento County is, and was at the time of defendant's trial, a large metropolitan area, with a population of over a million, including approximately 850,000 potential jurors. Based on these statistics, and defendant's surveys of the public's awareness of and attitude toward the case, the trial court concluded there were 425,000 people in the county who had not formed an opinion adverse to defendant, and 110,000 who had not heard of the case. This suggested that a panel of unbiased jurors could be found to try the case. Indeed, in *People v. Pride* (1992) 3 Cal.4th 195, 224 [10 Cal.Rptr.2d 636, 833 P.2d 643], we upheld the trial court's finding that Sacramento County's size "weighed heavily against a change of venue," even though in that case the trial occurred roughly a decade before the trial here, at a time when the county's population was significantly smaller.

The jurors selected to try this case bear out the trial court's conclusion that an unbiased jury could be found. Four jurors (Jurors Nos. 2, 4, 7, and 11) wrote in their questionnaires that they had no recollection of the case.[4] Six others (Jurors Nos. 1, 3, 5, 8, 9, and 12) had minimal recollections of the

---

[4] The prospective jurors were not told that the trial involved the man identified by the media as the "Thrill Killer;" instead, they were given the names of defendant and the victims, and were told that the case involved three people shot to death in a Quik Stop store in February 1991, and three more people shot to death in a nearby Round Table restaurant a week later. In a posttrial evidentiary hearing, a juror who had initially professed no recollection of the case testified that he had learned during the trial that this was the "Thrill Killer" case, and it is clear from his testimony that he had heard of the Thrill Killer before the trial. Thus, some or all of

matter: they said either that their memory of the case was vague, that they had read about it only in 1991 (four years before trial), or that they remembered the case but could not recall any details. Two other jurors (Jurors Nos. 6 and 10) had somewhat more extensive memories of the case,[5] but apparently this was not of great concern to the defense, which did not exercise a peremptory challenge against either juror even though it used only 13 of its 20 peremptory challenges. (See *People v. Daniels* (1991) 52 Cal.3d 815, 854 [277 Cal.Rptr. 122, 802 P.2d 906] ["In the absence of some explanation for counsel's failure to utilize his remaining peremptory challenges, or any objection to the jury as finally composed, we conclude that counsel's inaction signifies his recognition that the jury as selected was fair and impartial."].)

The fourth factor—community status of the defendant—did not weigh heavily for or against a change of venue. Although, as defendant points out, newspaper reports described him as a troubled "loner" with emotional and psychological problems, he had spent much of his childhood and all of his adult years in the Sacramento area, and he was not a member of any racial or ethnic group that could be subject to discrimination. (See *Odle v. Superior Court* (1982) 32 Cal.3d 932, 940, 942 [187 Cal.Rptr. 455, 654 P.2d 225] [the status of the defendant, a longtime resident of the county but a parolee described by the media as having mental problems, was a "neutral" venue factor].)

The fifth, and final, factor examines the prominence of the murder victims. Although, as defendant points out, media accounts of the victims portrayed them in a sympathetic light, they were not well known in the community. Thus, this factor weighed against a change of venue. (See *People v. Webb* (1993) 6 Cal.4th 494, 514 [24 Cal.Rptr.2d 779, 862 P.2d 779].)

In sum, after independently weighing the five factors described above, we conclude that defendant could, and did, obtain a fair trial in Sacramento County. Although the seriousness of the charges, the number of victims, and the media's heavy coverage and description of defendant as the "Thrill Killer" make this a close case, we agree with the trial court that defendant failed to show a reasonable likelihood that he could not have a fair trial without a change of venue.

---

the jurors who said they were unfamiliar with the case may have heard of the Thrill Killer, even though they did not recognize the case from the facts given in the jury questionnaire.

[5] An alternate who replaced Juror No. 10 during deliberations was also familiar with the case.

### B. *Admission of Defendant's Statements to Sheriff's Detectives and to Defendant's Father*

Before defendant was arrested, he was taken to the Sacramento County Sheriff's Department headquarters, where he made several damaging admissions. Later that evening, after he was placed under arrest, he made additional admissions to his father, who was permitted to have a recorded conversation with defendant in an interview room. The trial court denied defendant's motion to suppress these statements. Defendant now challenges that denial.

These are the pertinent facts:

On June 5, 1991, Lieutenant Raymond Biondi and Detective Stanley Reed went to defendant's home and asked him to come to the sheriff's department to give fingerprints and answer some questions about the murders. Defendant said he was busy, but he agreed to come the next day. Because defendant was unable to drive as a result of his epilepsy, Reed and Biondi picked him up the next day and drove him to the sheriff's station. Defendant, who was not handcuffed, sat in the back of the car. Defendant was fingerprinted and led to an interview room, where he was seated. The room contained a partially concealed video camera. Detective Reed then conducted a videotaped interview with defendant that lasted three and a half hours, during parts of which Lieutenant Biondi was also present.

At the beginning of the interview, Detective Reed told defendant he was not under arrest, he did not have to answer any questions, and he was free to leave anytime. Reed then asked defendant to take a lie detector test. Defendant said he would not do so without consulting an attorney, but he agreed to answer questions. Reed questioned defendant extensively about his activities on the two nights on which the murders occurred, and then asked permission to search defendant's apartment. Defendant refused, saying he would not do so without speaking to an attorney. Reed then asked him about his familiarity with and use of firearms. After initially denying that he had a gun or bullets, defendant said he had bought ammunition for a friend before a camping trip. He refused to name the friend, and asked to make a telephone call. He was allowed to do so. After the telephone call, defendant told Biondi and Reed that the person he had spoken to had advised him to leave, but that he wanted to "get it over with."

Defendant then asked if he could make another telephone call. Detective Reed permitted him to do so and left the interview room. Defendant called his father, Douglas Leonard, and told him that the bullets used in the murders were the same kind as those used in his father's gun, and that defendant had bought some bullets and had put them in his father's ammunition box. After

defendant completed the call, Lieutenant Biondi and Detective Reed came back into the interview room, and defendant made a second telephone call to his father. This time, Lieutenant Biondi spoke to defendant's father and confirmed that the father owned a gun. Defendant then told Biondi and Reed that the bullets he had bought were the same kind of bullets as those used in the murders.

Lieutenant Biondi and Detective Reed dropped defendant off at his home, where they took possession of his trenchcoat, a pair of shoes, and a box of bullets. They then went to his father's home, where another deputy, Detective Fancher, took possession of the father's gun. That evening, Biondi and Reed learned that ballistics tests established the gun as the murder weapon, and they returned to the father's house, where they arrested defendant. The father told Biondi and Reed that defendant had told him that he had committed the murders. Biondi and Reed transported defendant back to the sheriff's department, where they placed him in the same interview room as before.

At Detective Reed's request, defendant's father also came to the station. He asked to speak to defendant, explaining that he believed that someone else had masterminded the murders, and he wanted to see if defendant would tell him who it was. Detective Reed told the father he could talk to defendant but the conversation would be recorded. As the father entered the room where defendant was, Detective Reed told the two men that he and Lieutenant Biondi would be "monitoring" the conversation, and the father then told defendant their conversation would be "taped." In the ensuing conversation, the father repeatedly asked defendant whether anyone else was involved in the murders, and defendant said no one else was.

At the evidence suppression hearing, the videotaped conversations were played, and Detective Reed testified to the events set forth above. The defense called Dr. William Lynch, the neuropsychologist who also testified at the competency hearing and at the guilt phase of trial. He described defendant's mental limitations and concluded, after viewing the videotape of the interrogation, that the environment of the interrogation room was coercive and defendant did not know he was free to leave, and that defendant had a seizure near the end of the questioning by Lieutenant Biondi and Detective Reed.

### 1. *Defendant's initial interrogation: alleged* Miranda *violation*

Defendant contends his statements in the initial interrogation conducted by Lieutenant Biondi and Detective Reed were illegally obtained because they did not advise him of his *Miranda* rights.

■ "Before being subjected to 'custodial interrogation,' a suspect 'must be warned that he has a right to remain silent, that any statement he does

make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 732 [60 Cal.Rptr.2d 1, 928 P.2d 485], quoting *Miranda v. Arizona* (1966) 384 U.S. 436, 444 [16 L.Ed.2d 694, 86 S.Ct. 1602].) Here, it is undisputed that at the time of the interrogation defendant was a suspect: Detective Reed so testified at the hearing on defendant's suppression motion. The trial court found, however, that there was no need to advise defendant of his *Miranda* rights because he was not subjected to custodial interrogation. Defendant challenges that ruling.

An interrogation is custodial when "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda v. Arizona, supra*, 384 U.S. at p. 444.) Whether a person is in custody is an objective test; the pertinent inquiry is whether there was " ' "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." ' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 401 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. (*People v. Ochoa, supra*, 19 Cal.4th at p. 401.) When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must "apply a deferential substantial evidence standard" (*id.* at p. 402) to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, "a reasonable person in [the] defendant's position would have felt free to end the questioning and leave" (*ibid.*).

Defendant asserts that to determine whether a reasonable person in his position would have felt free to leave, we must decide whether a reasonable person with defendant's age, low intelligence, and developmental disability would have felt free to leave. Neither this court nor the United States Supreme Court has decided whether these factors should be considered in deciding whether a suspect is in custody (see generally *Yarborough v. Alvarado* (2004) 541 U.S. 652, 666–668 [158 L.Ed.2d 938, 124 S.Ct. 2140]), but we will assume for the sake of argument that these factors may be considered. Defendant also points out that the interrogation was initiated by the deputies, that he was fingerprinted before being questioned; that the interrogation was relatively long (three and a half hours) and took place in an interrogation room in the sheriff's department; that the door to the interrogation room was closed and Detective Reed sat between defendant and the door; and that when, on one occasion, defendant tried to go down the hall to the bathroom, Detective Reed escorted him back to the interrogation room, asking him to wait in the interrogation room and not to "wander around."

Notwithstanding the facts cited by defendant, we agree with the trial court that he was not subjected to custodial interrogation. Detective Reed repeatedly told defendant that he was not under arrest and he was free to end the questioning at any time and leave. Indeed, at the end of the interrogation the deputies did not arrest him; instead they took him home. When defendant asked to use the telephone, he was permitted to do so. (See *Miranda v. Arizona, supra,* 384 U.S. at p. 445 [*Miranda* warnings are designed to protect suspects who are "cut off from the outside world" and subjected to "incommunicado interrogation."].) The door to the interrogation room was not locked, and when defendant was left alone to make his telephone calls, he left the room to use the bathroom. Significantly, after using the telephone, defendant told Detective Reed that the person he had spoken to had advised him to leave, but he preferred to remain and answer questions, and he later told his father on the telephone that he was "free to go." Although "the . . . determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by . . . the person being questioned" (*Stansbury v. California* (1994) 511 U.S. 318, 323 [128 L.Ed.2d 293, 114 S.Ct. 1526]), defendant's comments reinforce our view that a reasonable person in his position would have felt free to leave.

2. *Defendant's conversation with his father: alleged* Miranda *violation*

Defendant contends the trial court should have suppressed his videotaped conversation with his father, held in an interrogation room at the sheriffs' department, because *Miranda* warnings did not precede that conversation. (See *Miranda v. Arizona, supra,* 384 U.S. 436.) Unlike defendant's initial conversation with Lieutenant Biondi and Detective Reed, there is no dispute that defendant was in custody when the conversation with his father occurred, because it came after his arrest for the murders. But the trial court, noting that *Miranda* warnings are required only before a custodial *interrogation,* ruled that no *Miranda* warnings were required because defendant's conversation with his father was not an interrogation.

Defendant challenges that ruling. He relies on *Rhode Island v. Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297, 100 S.Ct. 1682], which states that interrogation includes a "practice that the police should know is reasonably likely to evoke an incriminating response from a suspect." According to defendant, allowing his father to have a recorded conversation with him in an interrogation room was a form of interrogation because the deputies knew the conversation was reasonably likely to invoke an incriminating response.

The United States Supreme Court rejected a similar claim in *Arizona v. Mauro* (1987) 481 U.S. 520 [95 L.Ed.2d 458, 107 S.Ct. 1931] (*Mauro*).

There, the high court held that police officers did not violate the defendant's *Miranda* rights by granting the defendant's wife's request to talk to him in the presence of an officer, after the defendant had invoked his right to counsel. The court stressed that the purpose of *Miranda* is to "prevent[] government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment" (*id.* at pp. 529–530) and that in *Mauro* the officers did not "implicate this purpose" (*id.* at p. 530) by allowing the defendant's wife to talk to him.

Defendant claims this case is distinguishable from *Mauro* because Lieutenant Biondi and Detective Reed, unlike the officers in *Mauro*, allowed defendant's videotaped conversation with his father for the sole purpose of obtaining incriminating evidence; and Biondi and Reed, unlike the officers in *Mauro*, had good reason to believe the conversation would elicit such evidence. These distinctions, however, are not significant. "Officers do not interrogate a suspect simply by hoping that he will incriminate himself." (*Mauro, supra*, 481 U.S. at p. 529.) A defendant's "conversations with his own visitors are not the constitutional equivalent of police interrogation." (*People v. Gallego* (1990) 52 Cal.3d 115, 170 [276 Cal.Rptr. 679, 802 P.2d 169]; see also *People v. Mayfield, supra*, 14 Cal.4th at p. 758.) In short, "[p]loys . . . that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." (*Illinois v. Perkins* (1990) 496 U.S. 292, 297 [110 L.Ed.2d 243, 110 S.Ct. 2394].) Here, Lieutenant Biondi and Detective Reed did not compel or coerce defendant to talk to his father. Thus there was no need for *Miranda* warnings before the conversation.

### 3. *Allegation that the statements were involuntary*

Defendant asserts that the trial court should have suppressed both his initial statement to the police and his later conversation with his father because they were involuntarily obtained.

■ "It long has been held that the due process clause of the Fourteenth Amendment to the United States Constitution makes inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion. [Citations.] A statement is involuntary [citation] when, among other circumstances, it 'was " 'extracted by any sort of threats . . . , [or] obtained by any direct or implied promises, however slight . . . .' " ' [Citations.] Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.' [Citations.]" (*People v. Neal* (2003) 31 Cal.4th 63, 79 [1 Cal.Rptr.3d 650, 72 P.3d 280].)

On appeal, we uphold the trial court's findings of historical fact, but we independently review its determination that defendant's statements were

voluntary. (*People v. Holloway* (2004) 33 Cal.4th 96, 121 [14 Cal.Rptr.3d 212, 91 P.3d 164]; *People v. Neal, supra*, 31 Cal.4th at p. 80.)

In arguing that his statements were involuntary, defendant stresses his limited intelligence and developmental disability; his lack of experience with law enforcement (only one prior arrest for shoplifting); the circumstance that the statements were made in a small, windowless interrogation room; the length of the interrogation (three and a half hours); and defendant's dependence on Lieutenant Biondi and Detective Reed for a ride home after the interrogation was complete. But a statement is voluntary unless there is "coercive police activity." (*Colorado v. Connelly* (1986) 479 U.S. 157, 167 [93 L.Ed.2d 473, 107 S.Ct. 515]; see also *People v. Smith* (2007) 40 Cal.4th 483, 502 [54 Cal.Rptr.3d 245, 150 P.3d 1224]; *People v. Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330].) Here Biondi and Reed did not coerce defendant. During the initial interrogation they repeatedly told him he was free to leave anytime, and during defendant's conversation with his father they were not even present. At no time did they say or do anything to imply that defendant was required to talk. We therefore independently conclude that, as the trial court ruled, defendant's statements were voluntary.

### 4. *Other allegations*

Defendant asserts the videotaping of his end of his telephone call to his father from the interrogation room violated the federal Constitution's Fourth Amendment, the California Constitution's right to privacy, and title III of the federal Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. § 3711). He may not rely on the latter two grounds, however, because he did not raise them at trial. (*People v. Combs* (2004) 34 Cal.4th 821, 845 [22 Cal.Rptr.3d 61, 101 P.3d 1007].) In any event, the claim lacks merit. The trial court found that defendant had no reasonable expectation of privacy because he knew he was being videotaped when he made the call. Detective Reed's testimony that defendant noticed the video camera provides substantial evidence to support this finding.

Defendant also contends Lieutenant Biondi and Detective Reed violated the federal Constitution's Fourth Amendment, the California Constitution's right to privacy, and title III of the federal Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. § 3711) by audiotaping a conversation between his father and other family members, as well as a conversation between his father and Detective Reed. He may not raise this claim because he failed to raise it at trial. (*People v. Combs, supra*, 34 Cal.4th at p. 845.) In any event, defendant's own privacy rights were not violated because he was not a participant in these conversations.

## C. *Admission of Defendant's In-court Admission of Guilt*

On September 13, 1994, the trial court was considering a defense motion to exclude the media from the hearing on defendant's motion for change of venue, when this exchange occurred:

The Court: "Let's take a short break. [¶] Defendant has his finger up."

Defendant: "I am guilty."

The defense later moved to bar the prosecution from using defendant's statement at trial. The trial court denied the motion. At trial, the prosecutor called court reporter Mary Corbitt, who testified that she heard defendant say he was guilty, and that she recorded this statement in the transcript.

Defendant argues that his statement was an offer to plead guilty and was therefore inadmissible under Evidence Code section 1153, which states: "Evidence of a plea of guilty, later withdrawn, or of *an offer to plead guilty to the crime charged* or to any other crime, made by the defendant in a criminal action is inadmissible in any action or in any proceeding of any nature, including proceedings before agencies, commissions, boards, and tribunals." (Italics added; see also Pen. Code, § 1192.4 [A plea of guilty that is not approved by the court "may not be received in evidence in any criminal, civil, or special action or proceeding of any nature"].) The purpose of Evidence Code section 1153 is "to promote the public interest by encouraging the settlement of criminal cases without the necessity of a trial." (*People v. Sirhan* (1972) 7 Cal.3d 710, 745 [102 Cal.Rptr. 385, 497 P.2d 1121].)

We agree with the trial court that defendant's in-court outburst declaring that he was guilty was not a "bona fide offer to plead guilty" (*People v. Sirhan, supra,* 7 Cal.3d at p. 746), but simply an "unsolicited admission[]" (*People v. Posten* (1980) 108 Cal.App.3d 633, 648 [166 Cal.Rptr. 661]), that was not made inadmissible by Evidence Code section 1153. Defendant did not say he wanted to enter a plea of guilty; that is, to formally admit that he had committed each of the charged crimes. Rather, he said he *was* guilty, without explaining what he was guilty of. No plea negotiations were underway, and to exclude statements of this kind would not encourage the settlement of criminal cases. Thus, the trial court properly denied defendant's motion to exclude the statement.[6]

---

[6] Defendant points out that the host of a nationally syndicated radio talk show described defendant's "I am guilty" outburst at trial as a plea of guilty when he criticized the trial court for suspending proceedings to determine defendant's competency after the outburst. The

### D. *Prosecutor's Alleged Failure to Control Witness*

Detective Robert Bell testified for the prosecution that he had spoken to defendant while investigating the murders in this case. The prosecutor asked Bell, "And what did you tell him?" Bell replied: "I explained to him that we were doing the investigation regarding *the thrill killer*, and that his name had come up as a result of being spoken to by officers the other evening, and asked if he'd be willing to come down to the sheriff's department to talk to me." (Italics added.) The defense made no objection. During the next recess, the trial court told the prosecutor, "prior to reconvening, will you have a word with regard to Detective Bell in terms of the stipulation that we have in terms of not referencing this matter as the thrill killer case?" The prosecutor agreed to do so. The stipulation referred to by the trial court does not appear in the record.

Defendant contends the trial court's comments show that the parties had stipulated that counsel and the witnesses would not mention that this was the matter referred to in the news media as the "Thrill Killer" case. Based on this alleged stipulation, defendant asserts the prosecutor committed misconduct by asking the question that elicited Detective Bell's reference to the Thrill Killer. We assume for the sake of argument that the parties entered into such a stipulation. Nonetheless, defendant has forfeited the right to raise this claim because he did not object to the prosecutor's question at trial. (*People v. Michaels* (2002) 28 Cal.4th 486, 528 [122 Cal.Rptr.2d 285, 49 P.3d 1032].)

Even if defendant had preserved the issue, we would reject his contention. The prosecutor's question was innocuous, and there is no evidence that he asked it with the intent to elicit a reference to the Thrill Killer. Defendant argues it does not matter whether the prosecutor intended to elicit the reference when he asked the question, pointing out that misconduct may occur even when the prosecutor acts in good faith. We disagree. True, if the prosecutor had asked a question that was likely to elicit a reference to the Thrill Killer, the question would have been misconduct even if the prosecutor did not intend to elicit such a reference. (See *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673]; *People v. Bolton* (1979) 23 Cal.3d 208, 213–214 [152 Cal.Rptr. 141, 589 P.2d 396].) But here the prosecutor's question was proper because it was not inherently likely to elicit a reference to the Thrill Killer and there was no evidence that the prosecutor asked it with the intent to elicit such a reference.

██ Defendant claims the prosecutor committed misconduct by failing to admonish Detective Bell, before he testified, not to refer to defendant as the

commentator, however, was not a lawyer, did not witness defendant's outburst, and had no personal knowledge of why it happened; thus, his characterization of it as a guilty plea is irrelevant.

Thrill Killer before he testified. This contention would lack merit even if defendant had not forfeited it by failing to object at trial. "A prosecutor has the duty to guard against statements by his witnesses containing inadmissible evidence. [Citations.] If the prosecutor believes a witness may give an inadmissible answer during his examination, he must warn the witness to refrain from making such a statement." (*People v. Warren* (1988) 45 Cal.3d 471, 481–482 [247 Cal.Rptr. 172, 754 P.2d 218].) Here, the record does not show that the prosecutor had reason to believe that Detective Bell might refer to the Thrill Killer in his testimony, nor does it show what the prosecutor said to Bell on the subject before Bell testified. Thus, there is no evidence that the prosecutor violated his duty to guard against impermissible references during Bell's testimony.

### E. Alleged Prosecutorial Misconduct

Defendant contends the prosecutor committed repeated acts of misconduct in his closing arguments to the jury. Defendant's failure to object at trial bars him from asserting this claim on appeal. (*People v. Kennedy* (2005) 36 Cal.4th 595, 626 [31 Cal.Rptr.3d 160, 115 P.3d 472].) Defendant argues we should overlook his failure to object because the prosecutor's allegedly improper statements were so frequent that objections would have been futile. (See *People v. Hill, supra*, 17 Cal.4th at p. 821.) We disagree. As we explain, most of the challenged statements were proper and none of them prejudiced defendant.

Defendant claims the prosecutor improperly appealed to the jurors' passions and fears by repeatedly asking them to imagine themselves in the position of the murder victims. As a general rule, a prosecutor may not invite the jury to view the case through the victim's eyes, because to do so appeals to the jury's sympathy for the victim. (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 [17 Cal.Rptr.2d 174, 846 P.2d 756]; *People v. Fields* (1983) 35 Cal.3d 329, 363 [197 Cal.Rptr. 803, 673 P.2d 680].) Here, however, the challenged comments had a permissible purpose. Defense counsel had argued that defendant could not have been the killer because he was so weak and ineffectual that if he had tried to rob the victims they would have been able to take away his gun, or they would have scattered when he started shooting. In this argument, it was defense counsel who asked the jurors to picture themselves as victims of the Round Table Pizza restaurant robbery. In rebuttal, the prosecutor explained to the jury how the victims might have believed that cooperating with defendant would lessen their chances of bodily harm. He, too, asked the jurors to put themselves in the victims' place. We see nothing wrong with this approach, which was a reasoned rebuttal to defense counsel's argument, not an appeal to the jurors' sympathy for the victims.

The prosecutor also asked the jurors to imagine the thoughts of the victims in their last seconds of life.[7] We agree with defendant that this was improper. (See *People v. Stansbury, supra*, 4 Cal.4th at p. 1057.) But the prosecutor's passing remark could not have prejudiced defendant, given the overwhelming evidence of guilt.

Defendant accuses the prosecutor of misconduct in describing defendant as a "fool," a man who "looks like a harmless fool," an "odd" and "strange" person, and a "very cunning individual" who is "much like an animal." These comments were proper because they were "reasonably warranted by the evidence." (*People v. McDermott* (2002) 28 Cal.4th 946, 1002 [123 Cal.Rptr.2d 654, 51 P.3d 874].) Defendant also complains that the prosecutor told the jury that witness Sallie Jane Thomas had described defendant as having "shark-like" eyes, when Thomas actually never did so, but this minor inaccuracy was harmless under any standard.

In response to defense counsel's argument that prosecution witness Sallie Jane Thomas (who was engaged to one of the murder victims) should not be credited because she "lost her fiancé, and she wants somebody punished," the prosecutor said: "At 11:25 Sallie Thomas sees a person wearing a trench coat walking in the direction of Auburn Boulevard on Annadale Lane. [¶] Now certainly she's grieving, certainly she's angry, certainly she wants justice, but did she imagine she saw a man in a trench coat? Did she make that up out of whole cloth? No, she didn't." Defendant argues that by this comment the prosecutor was improperly "vouching" for Thomas. In our view, the prosecutor did not do so; instead, he merely argued that Thomas's testimony was credible. We find no error.

In his rebuttal the prosecutor, after acknowledging that defendant did not have the burden of proof, went on to say: "But [defendant] has an obligation when he undertakes to put evidence on to be true to you, the people that he's asking—he's asking you to believe his evidence. So he has an obligation to be true to you. [¶] And what did he prove? What did he prove? [¶] In a week and a half's worth of testimony, he proved that he has epilepsy." The prosecutor then pointed out that the defense had called a ballistics expert, Dr. John Thornton, to testify about the crime scenes, but that the defense had not questioned Thornton about the testimony of the prosecution's expert witness that the gun belonging to Douglas Leonard, defendant's father, had

---

[7] The prosecutor said: "You know, Ms. Lange talk [*sic*] about in connection with the Round Table Pizza, imagine yourself, put yourself there. I ask you to put yourself there, also. [¶] Imagine in that last millisecond before the lights go out, when you hear the report of the gun, when you feel the wetness, which they do not know but we would know, the small vapor of blood that is blown out the back or the side of their head and they fall to the floor, and in their last moment of consciousness, they think, I misjudged this man."

fired the fatal shots. Defendant contends this argument by the prosecutor improperly shifted to the defense the burden of proving that the gun was not the murder weapon and implied that the defense had not met this burden. In our view, the prosecutor's argument did not shift the burden of proof; rather, he was simply contending that the defense witnesses had not undermined the prosecution's case.

In closing argument, defense counsel noted there were no bloodstains on the trenchcoat and the gloves found in defendant's apartment when he was arrested, four months after the murders. In rebuttal, the prosecutor told the jury: "[L]et's give Mr. Leonard a little bit of credit, huh? I mean, obviously, he has a full scale 80 IQ. Again, you don't have to be a rocket scientist to entertain this thought. Here's the thought I want you to entertain: [¶] As soon as I leave [Detective] Robert Bell's company and he takes me back home, what am I going to do? I'm going to think about all the things that might have evidentiary value. I'm going to get rid of them, clean them up or something. I don't want these cops to pin this on me. [¶] And he had four months to do that. He didn't have 24 hours. He didn't have one afternoon. He had a whole lot of time, and he knew that the cops were out there."

Defendant claims this argument was improper because there was no evidence that he had cleaned his clothing to remove the bloodstains. The prosecutor, however, did not suggest there was any such evidence. Rather, he merely pointed out that the absence of bloodstains on the coat and gloves did not mean defendant was innocent, because defendant had ample time to clean the clothes in the four months that elapsed between the time Detective Bell first interviewed him and the time he was arrested for the murders. We see nothing improper in this argument.

Finally, defendant accuses the prosecutor of misconduct when he briefly mentioned defendant's refusal to take a polygraph test. But defendant's refusal to take the test was included in defendant's statement to the police, which the court admitted into evidence. Although the portion of defendant's statement in which he refused to take the test was subject to exclusion upon proper objection (Evid. Code, § 351.1), the defense did not object, and the prosecutor was free to comment on it once it was admitted into evidence.

### F. *Trial Court's Midtrial Dismissal of Juror*

On the morning of Monday, October 23, 1995, after the guilt phase of trial had been underway for a month, the trial court told the parties that the previous evening a juror had left a recorded telephone message at the court saying that the juror's father-in-law had died over the weekend. After receiving the message, the court explained, the court clerk telephoned the

juror's home; unable to reach the juror, the clerk talked to the juror's wife. She said her father had been killed in an automobile accident, that she and her husband would be attending the out-of-town funeral, and that her husband would be unavailable as a juror for the rest of the week. The court announced its tentative intention to discharge the juror and to replace him with an alternate.

The prosecutor and defense counsel both objected, each stating a preference to keep the juror. The trial court overruled their objections and replaced the juror. Defendant argues the court violated section 1089 and his "rights to a chosen impartial tribunal, due process, and a reliable judgment under the Fifth, Sixth, and Fourteenth Amendments" to the federal Constitution, as well as analogous provisions of the state Constitution. We disagree.

Section 1089 provides: "If at any time . . . a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall . . . be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors." "Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged." (*People v. Espinoza* (1992) 3 Cal.4th 806, 821 [12 Cal.Rptr.2d 682, 838 P.2d 204].) On appeal, the trial court's determination is reviewed for abuse of discretion. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1029 [108 Cal.Rptr.2d 291, 25 P.3d 519]; *People v. Ashmus* (1991) 54 Cal.3d 932, 987 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

Defendant claims the trial court did not conduct an adequate inquiry to determine whether discharge of the juror was necessary, because neither the court nor the court clerk spoke to the juror himself. We disagree. Although it would have been preferable for the clerk to have spoken to the juror himself, we conclude the juror's absence from court, combined with his recorded telephone message to the court explaining his absence and the information provided to the clerk by the juror's wife, was adequate to inform the court why the juror was not present, the reason for his absence, and the length of time he would be unavailable for jury service. No further inquiry was required.

We also reject defendant's claim that the trial court abused its discretion when it found good cause to discharge the juror. We have in the past rejected similar claims in similar circumstances. (See *People v. Cunningham, supra,* 25 Cal.4th at pp. 1028–1030 [juror's father near death after suffering stroke];

*People v. Ashmus, supra,* 54 Cal.3d at pp. 986–987 [death of juror's mother]; *In re Mendes* (1979) 23 Cal.3d 847, 852 [153 Cal.Rptr. 831, 592 P.2d 318] [death of juror's brother].) Although defendant tries to distinguish these cases on the ground that in each matter the juror expressly asked to be discharged, no such request is required. (See *Cunningham, supra,* at pp. 1029–1030.)

Defendant's contention that the discharge violated the state and federal Constitutions is based on the argument that the discharge violated section 1089, a premise we just rejected. Defendant acknowledges that we have held that section 1089 "does not offend constitutional proscriptions" (*People v. Collins* (1976) 17 Cal.3d 687, 691 [131 Cal.Rptr. 782, 552 P.2d 742]) and he does not argue to the contrary. Thus, our conclusion that the trial court did not violate that statute necessarily disposes of his constitutional claims.

### G. *Alleged Juror Misconduct*

Defendant contends his six murder convictions must be reversed because of three instances of juror misconduct at the guilt phase of trial. We address each in turn.

#### 1. *Refusal to deliberate*

After the verdict, defendant moved for a new trial, alleging that Juror No. 8 was guilty of misconduct for refusing to participate in guilt phase deliberations. Defendant submitted affidavits from four jurors (Jurors Nos. 2, 3, 5, and 12), each of which stated that at the outset of deliberations, Juror No. 8 said that defendant was guilty as charged and there was nothing to discuss. During the rest of the guilt phase deliberations, as the other jurors sat around the table discussing the case, Juror No. 8 sat in a corner reading a book. Attempts by other jurors to involve him in the deliberations were unsuccessful.[8]

The prosecutor did not dispute the accuracy of the declarations. While he acknowledged that Juror No. 8's refusal to deliberate was "perhaps misconduct," he argued that any such misconduct did not give rise to a presumption of prejudice. The trial court agreed with the prosecutor and denied defendant's motion for a new trial.

 We agree with defendant that Juror No. 8 committed misconduct by refusing to deliberate. "A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not

---

[8] The declarations also stated that at the outset of the penalty phase deliberations, Juror No. 8 announced his view that defendant should be sentenced to death, and thereafter retired to a corner of the room to read his book. We address defendant's claim that Juror No. 8 committed prejudicial misconduct during the penalty phase deliberations in part IV.D.2, *post.*

participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485 [106 Cal.Rptr.2d 313, 21 P.3d 1225].) Here, Juror No. 8 committed *all three* of the acts that, we said in *Cleveland*, are examples of a refusal to deliberate: He expressed a fixed conclusion at the beginning of deliberations and refused to consider other points of view, he refused to speak to other jurors, and he tried to separate himself physically from the rest of the jury by sitting in a corner. This was misconduct. (*People v. Engelman* (2002) 28 Cal.4th 436, 443–444 [121 Cal.Rptr.2d 862, 49 P.3d 209].)

Defendant asserts that Juror No. 8's refusal to deliberate violated his right to a jury trial under article I, section 16 of the California Constitution. (See generally *People v. Collins, supra*, 17 Cal.3d at p. 693.) We need not decide whether he is correct, because any error was harmless.

■ Unlike other forms of juror misconduct that call into question a juror's impartiality (such as receiving extrinsic evidence or discussing the case with nonjurors), Juror No. 8 was without question an impartial juror. (See *People v. Nesler* (1997) 16 Cal.4th 561, 581 [66 Cal.Rptr.2d 454, 941 P.2d 87] ["An impartial juror is someone 'capable and willing to decide the case solely on the evidence' presented at trial."].) His misconduct pertained not to his ability to be fair, but to his behavior during deliberations: Because he concluded that the evidence of guilt was so overwhelming that there was nothing to talk about, he refused to discuss his conclusion with the other jurors. This misconduct resulted in the jury operating not as a single unit, but as two separate units: a group of 11 jurors who, after discussing the case among themselves, unanimously concluded that defendant was guilty, and a "group" consisting of a single juror (Juror No. 8), who separately reached the same conclusion.

Because both of these two entities, considering the case separately, unanimously reached the same conclusion (that defendant was guilty), the inference is inescapable that they would have reached the same conclusion if they had discussed the case together. Thus, the failure of the two entities to discuss the case with each other was harmless. Similarly, if the jury had divided itself into two groups of six, and each group had separately, but unanimously, concluded that defendant was guilty, no prejudice would result from the failure of the two groups to combine their discussions. Because each group reached a verdict, this is not the type of "structural error" that occurs when a jury, or even a single juror, fails to reach a verdict. (See *Sullivan v. Louisiana*

(1993) 508 U.S. 275, 280 [124 L.Ed.2d 182, 113 S.Ct. 2078] ["There being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the *same* verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless. There is no *object*, so to speak, upon which harmless-error scrutiny can operate."].)

Defendant contends that Juror No. 8's misconduct violated the *federal* Constitution. We disagree. That Constitution permits a verdict by less than 12 jurors (*Williams v. Florida* (1970) 399 U.S. 78, 102–103 [26 L.Ed.2d 446, 90 S.Ct. 1893]; see also *Apodaca v. Oregon* (1972) 406 U.S. 404, 406 [32 L.Ed.2d 184, 92 S.Ct. 1628] [federal Constitution does not require jury unanimity]), and the federal rules permit judges to accept an 11-juror verdict if a juror becomes unavailable. (Fed. Rules Crim.Proc., rule 23(b), 18 U.S.C.) Thus, if the trial court here had discharged Juror No. 8 without appointing a replacement, and the remaining 11 jurors had convicted defendant, it would not have violated the federal Constitution. (See *U.S. v. Barone* (1st Cir. 1997) 114 F.3d 1284, 1308, fn. 21, & cases cited therein.) It necessarily follows that the verdict returned by those 11 jurors along with Juror No. 8 did not violate the federal Constitution, notwithstanding the latter's refusal to participate in the deliberative process. Defendant also asserts that Juror No. 8's refusal to deliberate violated the federal Constitution because he prejudged the case. But we see no evidence of prejudging; rather, Juror No. 8 apparently concluded, based on the evidence presented at trial, that the evidence of defendant's guilt was so overwhelming that there was nothing left to discuss.

Defendant contends the trial court erred by failing to investigate the possibility of jury misconduct when the bailiff, after bringing an exhibit to the jury during deliberations, reported to the court that some jurors were "not participating." Assuming for the sake of argument that the court should have investigated, its failure to do so does not require reversal unless the record shows that defendant was prejudiced. (*People v. Burgener* (1986) 41 Cal.3d 505, 521–522 [224 Cal.Rptr. 112, 714 P.2d 1251].) Here, even if an investigation by the trial court had revealed that Juror No. 8 had been refusing to deliberate, we have just concluded that Juror No. 8's refusal to deliberate was harmless. It follows that the trial court's failure to investigate the possibility that a juror was refusing to deliberate was equally harmless.

### 2. *Jury's alleged failure to begin deliberations anew when alternate juror was substituted*

Guilt phase jury deliberations began on Tuesday, November 14, 1995. The jury deliberated on Tuesday afternoon, Wednesday, and Thursday morning, although the jury spent much of this time listening to audiotapes and viewing videotapes that were admitted into evidence, and listening to readback of

testimony. No deliberations were held Thursday afternoon because Juror No. 4 had become ill. On Friday Juror No. 4 was still ill, and the trial court learned that on Thursday night, a man had broken into Juror No. 10's home and forcibly sodomized her. The court declared a recess until Monday morning. That day, Juror No. 4 had recovered from her illness, but Juror No. 10 asked to be excused. The trial court replaced Juror No. 10 with an alternate juror. The jury then deliberated for roughly two and one-half hours before notifying the court that it had reached a verdict.

 Defendant points out that when, as here, a juror is replaced after the jury has engaged in deliberations, the jury must deliberate anew, and that the original jurors must be instructed to disregard their previous deliberations. (*People v. Collins, supra,* 17 Cal.3d at p. 694.) Defendant acknowledges that the jury here was instructed to do just that, but he contends it could not have done so because it deliberated for only a short time before arriving at its verdict. He argues that the original jurors' alleged failure to disregard their previous deliberations violates not only his right to jury trial under the state Constitution (see *Collins, supra,* at pp. 693–694), but also did not satisfy the heightened standard of reliability required in capital cases by the Eighth and Fourteenth Amendments to the federal Constitution.

There was no violation of either Constitution. Other than noting the brevity of the deliberations, defendant offers no reason to believe that the original jurors disregarded the trial court's instruction that they put aside their previous deliberations and begin anew. But the brevity of the deliberations proves nothing. (See generally *People v. Daugherty* (1953) 40 Cal.2d 876, 890 [256 P.2d 911] [guilty verdict after 75 minutes of deliberations at guilt phase of capital trial did not demonstrate jury bias]; *People v. Mundt* (1939) 31 Cal.App.2d 685, 690 [88 P.2d 767] [guilty verdict after six minutes of deliberations was not improper].) The newly constituted jury was not required to deliberate for the same length of time as the original jury, nor was it required to review the same evidence. When, as here, there are no indications to the contrary, we assume that the jurors followed the trial court's instructions and started afresh. (See *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 [286 Cal.Rptr. 801, 818 P.2d 84] ["The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions."].)

3. *Expressing an opinion about the accuracy of the murder weapon*

In declarations submitted by defendant in support of his new trial motion, Jurors Nos. 2, 3, and 5 mentioned that during the deliberations Juror No. 7 said he had experience firing handguns, and that the murder weapon was an

"up close and personal" gun that could be accurately fired at close range without expertise. Juror No. 12 stated, without elaboration, that Juror No. 7 told the jury that he had " 'plenty of experience firing handguns.' "

Defendant argues that Juror No. 7 committed misconduct "by introducing into deliberations extrinsic evidence, derived from his own expertise, which contradicted the testimony of the defense expert." We disagree.

 A jury's verdict in a criminal case must be based on the evidence presented at trial, not on extrinsic matters. (*People v. Nesler, supra*, 16 Cal.4th at p. 578.) Nevertheless, jurors may rely on their own experiences in evaluating the testimony of the witnesses. "Jurors do not enter deliberations with their personal histories erased, in essence retaining only the experience of the trial itself. Jurors are expected to be fully functioning human beings, bringing diverse backgrounds and experiences to the matter before them." (*Moore v. Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 741–742 [223 Cal.Rptr. 859].) "Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses: it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court. Such a weakness, however, must be tolerated. . . . [Otherwise,] few verdicts would be proof against challenge." (*People v. Marshall* (1990) 50 Cal.3d 907, 950 [269 Cal.Rptr. 269, 790 P.2d 676].)

Here, Juror No. 7 relied on his personal experience with firearms to form an opinion about the accuracy of the murder weapon, and he mentioned his experience to the other jurors when expressing his views during deliberations. His comments were a normal part of jury deliberations and were not misconduct. (See generally *People v. Yeoman* (2003) 31 Cal.4th 93, 162 [2 Cal.Rptr.3d 186, 72 P.3d 1166] [jurors' comments regarding drug use by family members and the jurors themselves were not misconduct]; *People v. Fauber* (1992) 2 Cal.4th 792, 838–839 [9 Cal.Rptr.2d 24, 831 P.2d 249] [same].)

### 4. *Cumulative error*

Defendant argues that he was prejudiced by the cumulative effects of the three alleged acts of misconduct described above. As we have explained, however, only one of the three—Juror No. 8's refusal to deliberate—was misconduct. Thus, there are no cumulative effects to consider.

## H. *Alleged Cumulative Guilt Phase Error*

Defendant asserts the combined effect of all of the errors at the guilt phase of trial requires reversal of his murder convictions. The only error we have found is the jury misconduct discussed in part III.G.1, *ante*. There is thus no cumulative error.

## IV. PENALTY ISSUES

### A. *Trial Court's Failure to Conduct New Competency Hearing During Penalty Phase*

Defendant argues that the testimony presented by the defense at the penalty phase of trial pertaining to the damage to his brain gave rise to new doubts as to defendant's competence to stand trial, and that after hearing this evidence the trial court should have suspended proceedings to hold a second competency trial.

██ "Once a defendant has been found competent to stand trial, a second competency hearing is required only if the evidence discloses a substantial change of circumstances or new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competence." (*People v. Medina* (1995) 11 Cal.4th 694, 734 [47 Cal.Rptr.2d 165, 906 P.2d 2]; see also *People v. Weaver, supra*, 26 Cal.4th at p. 954; *People v. Jones* (1991) 53 Cal.3d 1115, 1153–1154 [282 Cal.Rptr. 465, 811 P.2d 757].)

Defendant does not claim that the penalty phase evidence demonstrated a " 'substantial change of circumstances' " (*People v. Weaver, supra*, 26 Cal.4th at p. 954); he argues, however, that it cast " 'serious doubt on the validity of' " (*ibid.*) the prior competency finding. He points to testimony by Dr. Bruce Reed, a neuropsychologist, who concluded that a PET scan of defendant's brain showed severe damage to defendant's temporal lobes, hippocampi, and amygdalae, and he notes corroborating testimony by Dr. Timen Cermak, an expert in psychology and neurology. According to defendant, this testimony showed that the "traditional psychological approach" used by the doctors at the competency hearing "resulted in an incomplete understanding of [defendant's] condition because it failed to consider the brain damage underlying [defendant's] epilepsy as the central and defining feature of his personality," and thus the trial court should have ordered a new competency hearing.

██ Although Drs. Reed and Cermak testified at the penalty phase that defendant's seizure disorder had caused significant damage to his brain, persons with significant brain damage may nonetheless be competent to stand

trial. Neither doctor testified that defendant did not satisfy the statutory test for competence to stand trial, that is, that he lacked the ability to understand the nature of the proceedings or to cooperate with his counsel.

The doctors who testified at defendant's competency hearing had not seen the results of the PET scan of his brain that defendant's penalty phase witnesses cited as evidence of his brain damage, but they were well aware of defendant's seizure disorder as well as the likelihood of brain damage when they evaluated his competence to stand trial. For instance, Dr. Charles Schaffer's report, introduced as an exhibit at the competency hearing, mentioned that defendant had a seizure during his interview with Dr. Schaffer, and it made reference to electroencephalograph studies showing that defendant had "temporal lobe damage," and to Dr. William Lynch's finding that defendant had "an organic brain disorder with mild to moderate neuropsychologic impairment." Dr. Schaffer nevertheless concluded that defendant was competent to stand trial, an assessment that persuaded the trial court. Thus, the penalty phase testimony of Drs. Reed and Cermak did not cast " 'serious doubt on the validity of' " the previous competency determination (*People v. Weaver, supra,* 26 Cal.4th at p. 954), and that testimony did not necessitate a suspension of the criminal proceedings and a second competency hearing.

Defendant relies on *Odle v. Woodford* (9th Cir. 2001) 238 F.3d 1084. There, a federal appellate court held that the trial court in a capital case erred by failing to hold a competency hearing when the defendant presented evidence that he had a partial lobectomy after an automobile accident, after which he exhibited bizarre behavior that led several times to admissions to psychiatric wards. Decisions of the federal circuit courts are not binding on us, and in any event *Odle* is distinguishable. There, the trial court held *no* competency hearing, and the issue was whether it should have done so. By contrast, here the trial court held a hearing at which it found defendant competent to stand trial. The question is whether the court should have held a *second* hearing. The answer is no. We find nothing in *Odle*'s reasoning that would undermine that conclusion.

### B. *Alleged Prosecutorial Misconduct*

Defendant argues that the prosecutor improperly tried to minimize the jury's responsibility for its penalty decision (see *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633]) when he told the jury: "Regardless of what penalty is imposed on Mr. Leonard, you ought to think about this: Mr. Leonard is going to have some life. He is going to continue to live. Whether you give him the death penalty or life without the possibility of parole, it's not over for Mr. Leonard, at least not for the foreseeable future. [¶] For these people, it was over with five years ago.

There's nothing more. All the dreams, all the hopes, all the love, all the everything they had was snatched away from them in one second."

Although defendant did not object to the prosecutor's argument at trial, he is not barred from making this claim on appeal because no objection was required at the time of defendant's trial. (*People v. Moon* (2005) 37 Cal.4th 1, 17 [32 Cal.Rptr.3d 894, 117 P.3d 591]; *People v. Cleveland* (2004) 32 Cal.4th 704, 762 [11 Cal.Rptr.3d 236, 86 P.3d 302].) Nevertheless, we find no *Caldwell* error. The prosecutor's point was that the victims died as soon as defendant shot them, whereas defendant was still alive at the time of trial, five years after the murders, and he would still be alive during the appeal. Whether or not this was proper argument, it did not minimize the jury's responsibility for its penalty decision. (See generally *People v. Bittaker* (1989) 48 Cal.3d 1046, 1106 [259 Cal.Rptr. 630, 774 P.2d 659].) Moreover, the comment, even if improper, was a brief and oblique reference that was harmless under any standard of prejudice.

Defendant also asserts that the prosecutor tried to diminish the jury's responsibility for its decision when he told the jury that it would not be killing anyone by returning a verdict of death. That comment occurred in this argument by the prosecutor: "Now, certainly you have the responsibility for deciding Mr. Leonard's fate. No one will tell you, I will not tell you, no one will tell you anything to diminish that responsibility. It is a heavy responsibility. I know you take it seriously. [¶] However, you did not kill anyone. *You will not kill anyone.* You will make a decision based upon the evidence. It obviously has dire consequences, assuming you decide the death penalty is appropriate for Mr. Leonard." (Italics added.) Read in context, the italicized remark was an appropriate commentary on the nature of the jury's task, which was to "make a decision based on the evidence." The prosecutor was careful to remind the jury of the "dire consequences" of a death verdict and in no way diminished the jury's responsibility for its decision.

Defendant contends that several other remarks by the prosecutor in closing argument were misconduct. He may not now challenge those comments because he did not object to them at trial, nor did he ask the trial court to admonish the jury to disregard them. (*People v. Avila* (2006) 38 Cal.4th 491, 609 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) Defendant insists, however, that his motion "to restrict the scope of the prosecutor's penalty phase argument" preserved his right to challenge, on appeal, the prosecutor's statements in closing argument.

That defense motion, filed before the penalty phase began, was in essence a trial brief that summarized the limitations on prosecutorial argument at the penalty phase of a capital case. It explained, for example, that the prosecution

may not diminish the jury's sense of responsibility for its decision, may not make appeals based on race or religion, may not express personal views regarding the appropriateness of the death penalty, and must avoid inflammatory rhetoric. The prosecutor opposed the motion. Although he did not contest the principles of law outlined in the motion, he pointed out that whether a particular statement is misconduct may depend on the context in which it is made, and he urged the trial court not to make any ruling about misconduct in advance. The court denied defendant's motion, although it commented that the motion was a "useful document" that assisted both the court and the prosecutor by describing the applicable law.

We conclude that defendant's motion did not preserve his right to challenge, on appeal, the prosecutor's comments in question. As the prosecutor pointed out at trial, the remarks must be considered in context, and cannot be evaluated in advance. In any event, the comments in question were not misconduct, as explained below.

■ Defendant contends the prosecutor improperly appealed to the jury's passion and prejudice when: (1) he described the killings as "executions"; (2) he said that defendant "knows what it's like to shoot somebody and to see them go down . . . [,] what it's like to see . . . blood[, and] what kind of noises they make before they die"; (3) he argued that defendant took the victims' lives "in a manner that is obscene"; and (4) he asked the jury to show defendant "the same mercy he showed each of his victims." We disagree. "Unlike the guilt determination, where appeals to the jury's passions are inappropriate, in making the penalty decision, the jury must make a moral assessment of all the relevant facts as they reflect on its decision. [Citations.] Emotion must not reign over reason and, on objection, courts should guard against prejudicially emotional argument. [Citation.] But emotion need not, indeed, cannot, be entirely excluded from the jury's moral assessment." (*People v. Smith* (2003) 30 Cal.4th 581, 634 [134 Cal.Rptr.2d 1, 68 P.3d 302].) Here the prosecutor's comments were emotional, but not excessively so. They were based on the evidence and fell within the permissible bounds of argument. (See *People v. Harrison* (2005) 35 Cal.4th 208, 259 [25 Cal.Rptr.3d 224, 106 P.3d 895]; *People v. Hughes* (2002) 27 Cal.4th 287, 395 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Ochoa, supra,* 19 Cal.4th at pp. 464–465; *People v. Haskett* (1982) 30 Cal.3d 841, 863–864 [180 Cal.Rptr. 640, 640 P.2d 776].)

Defendant challenges the prosecutor's argument that if sentenced to life without possibility of parole, defendant would have a relatively pleasant life in prison, during which he could further his education, pursue crafts and hobbies, and watch television. This argument was a reasonable commentary on the evidence. Although we have held that a trial court may exclude

evidence of the conditions of confinement that a defendant will experience if sentenced to life imprisonment without parole because it is "irrelevant to the jury's penalty determination" (*People v. Quartermain* (1997) 16 Cal.4th 600, 632 [66 Cal.Rptr.2d 609, 941 P.2d 788]), here the trial court permitted the defense to present such evidence. A defense witness, a retired prison administrator, described the conditions experienced by inmates sentenced to life imprisonment without possibility of parole and said defendant would adjust well if he received such a sentence. Once this evidence was admitted, the prosecutor was entitled to comment on it.

In his closing argument, the prosecutor reminded the jury that the cousin of murder victim Zeid Obeid felt guilty because the last time he saw Obeid they quarreled about Obeid's job at Quik Stop (which the cousin presciently believed to be dangerous), and the argument ended with the cousin telling Obeid he hoped something bad would happen to him. He also reminded the jury that Obeid's body could not be returned to his parents' home in Kuwait for burial, and he had to be buried in Lebanon. (Although Obeid had lived almost his entire life in Kuwait, he was a citizen of Lebanon, and the Kuwaiti government refused the family's request for permission to bury the body in Kuwait because his residence permit had expired.) Defendant argues that these comments, and other similar references made by the prosecutor to the suffering experienced by the victims' families, were inflammatory and improper because they referred to circumstances beyond defendant's control.

We disagree. The evidence that close friends and relatives of the victims suffered emotional trauma as a result of their deaths was permissible victim impact testimony, and the prosecutor appropriately commented on it in his closing argument. (*People v. Panah, supra*, 35 Cal.4th at pp. 494–495; *People v. Benavides* (2005) 35 Cal.4th 69, 107 [24 Cal.Rptr.3d 507, 105 P.3d 1099].) The evidence that Obeid's family was unable to return his body to Beirut, Lebanon for burial was admitted without objection. Had an objection been made, the court would have determined the admissibility of the evidence. (See generally *People v. Harris* (2005) 37 Cal.4th 310, 352 [33 Cal.Rptr.3d 509, 118 P.3d 545].) Once that evidence was admitted the prosecutor was entitled to discuss it in his closing argument. There was no misconduct.

Finally, defendant accuses the prosecutor of trying to exploit the circumstance that the jury was beginning its deliberations five days before Christmas by pointing out to the jury that the pain felt by members of the victims' families would continue long after Christmas. We find no improper exploitation. Apparently concerned that the imminence of Christmas might influence the jury to spare defendant's life, the prosecutor urged the jury "not to be swayed by emotional buzz words [pertaining to the holiday], but to consider

the evidence, give it the weight that you find it's entitled to, and make this appropriate decision." He noted that the holiday season was for most people "a very joyous time of the year," but that it was a time of sorrow not only for defendant's family but also for the victims' families.

## C. *Alleged Instructional Error*

Defendant contends the trial court erred when it refused to give his two proposed instructions telling the jury it could consider sympathy or compassion for him.[9] We disagree. These instructions were unnecessary because the trial court instructed the jury that at the penalty phase of trial, unlike the guilt phase, "the law permits your verdict to be influenced by a variety of matters, including sympathy and compassion." Although defendant claims this instruction was inadequate because the jury might have construed it as meaning that the jury could consider sympathy for the victims' families rather than for defendant, the prosecutor repeatedly acknowledged in his closing argument that the instruction permitted the jury to consider sympathy for defendant. Defendant contends that one of his proposed instructions was superior to the one given by the court because, unlike the court's instruction, it stated the jury could base its sympathy for defendant on observations of him in court. (See *People v. Lanphear* (1984) 36 Cal.3d 163, 167 [203 Cal.Rptr. 122, 680 P.2d 1081] [sympathy for defendant may be based on jury's in-court observations].) But nothing in the trial court's instruction precluded the jury from basing its sympathetic feelings on its observations of defendant, and we see no need for an instruction expressly telling the jury it may do so.

## D. *Alleged Jury Misconduct*

As mentioned earlier, after the trial defendant filed a new trial motion asserting that several jurors committed misconduct during the deliberations at both the guilt and the penalty phases of trial. The trial court denied the motion. In part III.G. *ante*, we rejected defendant's contention that prejudicial

---

[9] The first proposed instruction stated: "Sympathy is not itself a mitigating 'factor' or 'circumstance,' but an emotion. Recognition that a jury's exercise of sentencing discretion in a capital case may be influenced by a sympathetic response to mitigating evidence is entirely consistent with that observation. The jury is permitted to consider mitigating evidence relating to the defendant's character and background, whether or not related to the offense for which he is on trial, precisely because that evidence may arouse 'sympathy' or 'compassion' for the defendant."

The second proposed instruction stated: "If a mitigating circumstance or an aspect of the defendant's background or his character called to the attention of the jury by the evidence or its observation of the defendant arouses mercy, sympathy, empathy, or compassion such as to persuade you that death is not the appropriate penalty, you may act in response thereto and impose a sentence of life without possibility of parole."

jury misconduct occurred at the guilt phase. We now reject defendant's claim that jury misconduct at the penalty phase of trial requires reversal of the judgment of death.

### 1. *Refusal to deliberate*

In defendant's new trial motion, he submitted four declarations stating that Juror No. 8's behavior during deliberations at the penalty phase was similar to his conduct during the guilt phase deliberations: At the start of the penalty phase deliberations, he announced his decision that defendant should get the death penalty, and he thereafter retreated to a corner, where he read a book as the other jurors deliberated.

Defendant argues that Juror No. 8's failure to deliberate requires reversal of the penalty phase verdict. For reasons similar to those explained in part III.G.1., *ante*, Juror No. 8's refusal to deliberate did not prejudice defendant. In Juror No. 8's view, death was so clearly the appropriate penalty that he saw no point in discussing the issue. It did not take long for the other 11 jurors to reach the same conclusion, after deliberations that lasted approximately one day. Thus, it appears that none of the jurors regarded the question of penalty as close and difficult, and we see no reasonable possibility that the jury would have reached a different result if Juror No. 8 had participated in the deliberations.

### 2. *False answers on voir dire*

Defendant contends that Juror No. 7 committed misconduct because he failed to disclose that he would automatically vote for the death penalty for any defendant convicted of first degree murder or of killing more than one person.

On the juror questionnaire, in response to the question whether his feelings about the death penalty were so strong that he would "<u>always</u>" vote to impose it on a defendant convicted of first degree murder or would "<u>never</u>" vote to do so, Juror No. 7 checked the line stating "neither of the above," and wrote, "Never say <u>Always</u> Never say <u>Never</u>." In response to the question, "Do you think anyone convicted of murdering more than one person should receive the death penalty?," Juror No. 7 checked "yes," and wrote, "Prevention of their ever killing again." Questioned later on voir dire regarding these responses, he explained: "I would come [to the penalty phase] with a Zen mind. I would come with a blank slate, saying 'okay, talk me into it or out of it.'"

Defendant's motion for new trial included a declaration from Juror No. 3 stating: "During penalty phase deliberations, juror number 7 refused to

consider any of the mitigating evidence which was raised by other jurors. Juror #7 response to each and every piece of evidence presented was 'it doesn't matter, he killed six people.' I asked Juror #7 if he would always vote for the death penalty when someone was convicted of killing six people, regardless of the mitigating circumstances. Juror #7 responded that he would; and added that he would also always vote for the death penalty even if there was only one victim. Juror #7 said that anyone who kills another person should get the death penalty."

Also attached to the new trial motion was a questionnaire the defense had sent to Juror No. 7 after the trial. When asked whether he had decided on defendant's punishment after hearing the evidence and arguments, but before deliberations began, Juror No. 7 answered "yes." The most important factor leading to his penalty decision, Juror No. 7 stated, was "six dead people." Asked to name the dispositive aggravating factors, Juror No. 7 responded, "corpus delicti."

Juror No. 7's answers to the last five questions on the postconviction questionnaire were written in Latin. When he was asked his opinion of the prosecutor, he responded "macte virtute." His opinion of lead defense counsel was "quare verum/bonis nocet quisquis pepercerit malis," his opinion of backup counsel was "ad meliora vertamur," and his opinion of defendant was "hoc habet." In response to the question whether there was anything else defense counsel should know, he wrote, "hominis est errare insipientis perseverare[;] hic fumis nihil attraxit."[10]

The trial court held an evidentiary hearing on the allegations pertaining to Juror No. 7. At the hearing, Juror No. 3's testimony was similar to, though slightly different from, his declaration. He said that "three or four times" Juror No. 7 said defendant's mitigating evidence "doesn't matter much" because defendant "killed six people." He said he had asked Juror No. 7 if he would always vote for death if the defendant was convicted of killing six

---

[10] At the hearing on the motion for new trial, Juror No. 7 translated his answers, and the parties agree that his translations are accurate as to four of the questions. His opinion of the prosecutor: "Well done." Of lead defense counsel: "Seek the truth, whomever spares the wicked harms the good." Of backup counsel: "Let's turn to better things." Of defendant: "He's had it."

The translation of Juror No. 7's answer to the last question is uncertain. Juror No. 7 testified it meant "once is enough." The trial court's staff translated it as: "It is human to err, for the one who is beginning to persevere the rope would not drag him down. (The hangman's rope)." Defendant asserts that the answer consists of two Latin maxims: "To err is human, but it is foolish to persist" and "This line (or rope) has dragged in nothing." The latter phrase, he explains, was originally generally used in reference to fishing, and the answer as a whole expresses Juror No. 7's view that the postconviction questionnaire was a waste of time. The Attorney General does not discuss the meaning of the answer, and we assume for the sake of argument that defendant's translation is accurate.

people, and that Juror No. 7 had replied: "No, not six people. He would do it for just one, even if one person was murdered."

Juror No. 7 testified that his voir dire answers were accurate. In his initial testimony pertaining to the allegations of misconduct, on Friday, May 3, 1996, he denied making the statements attributed to him by Juror No. 3. The next Monday, Juror No. 7 called the trial court and said he had some additional information pertaining to the new trial motion. The court told him that any information should be given on the witness stand, and asked him to return that afternoon. He then testified that during deliberations he had an argument with another juror. During the argument, the question arose whether Juror No. 7 would vote to impose the death penalty on a defendant who killed only once. Juror No. 7 said he "*could* give someone the death penalty if they only had cold-bloodedly, premeditatedly killed one person" (italics added), but he did not say he would automatically do so.

The trial court found no misconduct by Juror No. 7. Although the court described the juror as "very offensive" and characterized some of his testimony at the hearing on defendant's new trial motion as "appalling," it concluded that Juror No. 7 "fully, honestly, and accurately disclosed his basic support for the death penalty in his original questionnaire," and that it was not "reasonably probable that Juror Number Seven had prejudged the penalty phase in this case."

Defendant argues strenuously that Juror No. 7 lied when he testified on voir dire that he had an open mind and would not vote automatically to impose the death penalty, regardless of the mitigating evidence. In reviewing the trial court's ruling on this matter, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." (*People v. Nesler, supra,* 16 Cal.4th at p. 582.) Here, Juror No. 7 credibly testified at the posttrial hearing that his answers on voir dire were truthful. Based on that testimony, substantial evidence supports the trial court's ruling that Juror No. 7 did not prejudge the case.

Defendant faults the trial court for its refusal to decide whether Juror No. 7 or Juror No. 3 had accurately described the argument between them, contending that if the court had any doubt on the matter it should have summoned other jurors to testify. He relies on a federal decision holding that when, *in the middle of trial,* a question arises about the partiality of one of the jurors, the trial court has "an independent responsibility to satisfy himself that the allegation of bias is unfounded." (*Dyer v. Calderon* (9th Cir. 1998) 151 F.3d 970, 978.) Here, however, the allegation of juror bias occurred not in the middle of trial, but at a hearing after trial. We need not decide here whether, as a general rule, a trial court has an independent responsibility to investigate

allegations of juror misconduct at a posttrial hearing, because here no further investigation was warranted. The pertinent issue at the hearing was not what Juror No. 7 and Juror No. 3 said in the heat of deliberations, but whether Juror No. 7 had lied at voir dire and was biased against defendant. The trial court believed Juror No. 7's posttrial testimony that he had testified truthfully on voir dire and that he had not prejudged the case, and the court added that its view would not be affected by ascertaining what exactly Jurors Nos. 3 and 7 had said to each other. We agree with this assessment.

### 3. *Discussion of defendant's failure to testify at the penalty phase*

The trial court instructed the jury that defendant had a right not to testify at the penalty phase, that the jury should draw no inferences from a failure to do so, and that the jury should not discuss the matter or allow it to influence the jury's deliberations in any way. Nevertheless, according to two juror affidavits presented by defendant in support of his new trial motion, the jury discussed defendant's failure to testify during its deliberations. Juror No. 5 declared: "During penalty phase deliberations, several jurors, myself included, expressed the opinion that we would have liked for [defendant] to testify during the penalty phase so that we could better understand why he killed six people, and whether he was truly remorseful." Juror No. 12, the foreperson, declared: "During the penalty phase deliberations, jurors, myself included, discussed the fact that we would like to have heard [defendant] testify during the penalty phase so that we could better know him and understand the extent of his impairment. We discussed the fact that we would have liked to have heard [defendant's] reasons for committing the crimes as we felt this was not satisfactorily answered through the testimony of defense expert witnesses."

Defendant contends that by discussing his failure to testify at the penalty phase, the jury committed prejudicial misconduct. We disagree.

 The Fifth Amendment to the federal Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." A defendant may invoke this right at the penalty phase of a capital case, even though the risk of self-incrimination is diminished because the defendant has already been convicted. (*Estelle v. Smith* (1981) 451 U.S. 454, 462–463 [68 L.Ed.2d 359, 101 S.Ct. 1866]; *People v. Thompson* (1988) 45 Cal.3d 86, 124 [246 Cal.Rptr. 245, 753 P.2d 37]; *People v. Melton* (1988) 44 Cal.3d 713, 757 [244 Cal.Rptr. 867, 750 P.2d 741].) The right not to testify would be vitiated if the jury could draw adverse inferences from a defendant's failure to testify. Thus, the Fifth Amendment entitles a criminal defendant, upon request, to an instruction that will "minimize the danger that the

jury will give evidentiary weight to a defendant's failure to testify." (*Carter v. Kentucky* (1981) 450 U.S. 288, 305 [67 L.Ed.2d 241, 101 S.Ct. 1112].)

Here, by violating the trial court's instruction not to discuss defendant's failure to testify, the jury committed misconduct. (*People v. Hord* (1993) 15 Cal.App.4th 711, 721, 725 [19 Cal.Rptr.2d 55]; *People v. Perez* (1992) 4 Cal.App.4th 893, 908 [6 Cal.Rptr.2d 141].) This misconduct gives rise to a presumption of prejudice, which "may be rebutted . . . by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm." (*People v. Hardy* (1992) 2 Cal.4th 86, 174 [5 Cal.Rptr.2d 796, 825 P.2d 781]; see *People v. Danks* (2004) 32 Cal.4th 269, 303 [8 Cal.Rptr.3d 767, 82 P.3d 1249] [applying similar standard to allegations of juror bias]; *People v. Nesler, supra,* 16 Cal.4th at pp. 582–583 (lead opn.) [same].)

At the hearing on defendant's motion for a new trial, the trial court acknowledged that misconduct had occurred, but it ruled that defendant was not prejudiced by the juror comments on his failure to testify. In reviewing this ruling, we apply our independent judgment. (*People v. Danks, supra,* 32 Cal.4th at p. 303 [" 'Whether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination.' "].) Applying that standard, we agree with the trial court here that the jury's references to defendant's failure to testify did not prejudice defendant.

As mentioned earlier, the purpose of the rule prohibiting jury discussion of a defendant's failure to testify is to prevent the jury from drawing adverse inferences against the defendant, in violation of the constitutional right not to incriminate oneself. Here, the comments on defendant's failure to testify mentioned in defendant's new trial motion merely expressed regret that defendant had not testified, because such testimony might have assisted the jurors in understanding him better. In the words of the trial court: "I think that wanting to hear defendants testify is natural. We do the best we can to deter jurors from speculating and from drawing negative inferences, but merely referencing that they wish he would have testified is not the same as punishing the Defendant for not testifying. It is not the same as drawing negative inferences from the absence of testimony." We conclude there is no substantial likelihood that defendant was prejudiced by the jury's brief discussion of his failure to testify at the penalty phase.

### 4. *Discussion of the possibility that defendant may never be executed*

According to declarations defendant submitted in support of his motion for a new trial, the jury during its deliberations discussed the length of the appeal

process and the possibility that defendant may never be executed. Defendant argues this discussion was misconduct because it diminished the jury's sense of responsibility for its penalty decision. (See *Caldwell v. Mississippi, supra,* 472 U.S. 320, 330.) We have in the past rejected similar contentions (*People v. Majors* (1998) 18 Cal.4th 385, 420–422 [75 Cal.Rptr.2d 684, 956 P.2d 1137]; *People v. Cox* (1991) 53 Cal.3d 618, 693–696 [280 Cal.Rptr. 692, 809 P.2d 351]; see also *People v. Schmeck* (2005) 37 Cal.4th 240, 307 [33 Cal.Rptr.3d 397, 118 P.3d 451]; *People v. Mendoza* (2000) 24 Cal.4th 130, 195 [99 Cal.Rptr.2d 485, 6 P.3d 150]), and we see no need to revisit the issue.

Defendant also complains that, according to the foreperson's posttrial declaration, some jurors "discussed the premise that keeping someone in prison for the rest of their life is more costly to taxpayers than sentencing him to death." The foreperson, however, reminded the jury "this was not an appropriate consideration" in determining whether to impose the death penalty. Thus, assuming for the sake of argument that the jurors' comments on this subject were improper (see *Spaziano v. Florida* (1984) 468 U.S. 447, 461–462 [82 L.Ed.2d 340, 104 S.Ct. 3154]; *People v. Thompson, supra,* 45 Cal.3d at p. 132), the error was harmless.

### E. *Proportionality Review*

Defendant urges us to set aside his sentence of death because it is disproportionate to his individual culpability.

■ We do not engage in intercase proportionality review. (See, e.g., *People v. Maury* (2003) 30 Cal.4th 342, 441 [133 Cal.Rptr.2d 561, 68 P.3d 1].) But when, as here, the defendant so requests, we review the particular facts of a defendant's case to determine whether the death sentence is so disproportionate to the defendant's personal culpability as to violate the California Constitution's prohibition against cruel or unusual punishment. (See *People v. Rogers* (2006) 39 Cal.4th 826, 894 [48 Cal.Rptr.3d 1, 141 P.3d 135]; *People v. Steele* (2002) 27 Cal.4th 1230, 1269 [120 Cal.Rptr.2d 432, 47 P.3d 225]; *People v. Dillon* (1983) 34 Cal.3d 441, 478–489 [194 Cal.Rptr. 390, 668 P.2d 697].) Although defendant also asserts that article 14 of the International Covenant on Civil and Political Rights entitles him to this review, we need not decide whether he is correct, because California law requires it.

"To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal

characteristics of the defendant, including age, prior criminality, and mental capabilities. (*People* v. *Dillon, supra,* 34 Cal.3d at p. 479.) If the court concludes that the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' (*ibid.*), or, stated another way, that the punishment ' " 'shocks the conscience and offends fundamental notions of human dignity' " ' [citation], the court must invalidate the sentence as unconstitutional." (*People v. Hines* (1997) 15 Cal.4th 997, 1078 [64 Cal.Rptr.2d 594, 938 P.2d 388].)

In arguing that the death sentence is unconstitutional as applied to him, defendant stresses his youth (21 years old at the time of the murders), his low intelligence, his chronic and uncontrolled epilepsy, his brain damage, and his mental illness. We acknowledge the seriousness of defendant's disabilities, but nonetheless defendant committed two robberies during which he murdered six people by shooting them in the head, and to ensure the deaths of two of his victims he fired at close range, holding the gun less than two inches from their heads. On these facts, the death sentence is not grossly disproportionate to defendant's culpability.

█ Defendant asks this court to invoke sections 1181 and 1260 to reduce his sentence to life imprisonment without possibility of parole.[11] But under those sections, "we lack the power to overturn a judgment of death simply because we disagree with the jury's penalty determination" (*People v. Hines, supra,* 15 Cal.4th at p. 1080), and we may only reverse the judgment if we find "prejudicial error or legal insufficiency of evidence" (*ibid.*). Here we find neither.

### F. *Execution of Developmentally Disabled Defendant*

Defendant asserts his mental condition is "functionally indistinguishable from a mentally retarded individual," and to execute him would violate the federal Constitution's prohibition against cruel and unusual punishment, as

---

[11] Section 1181 provides in relevant part: "When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only: [¶] . . . [¶] 7. When the verdict or finding is contrary to law or evidence, but in any case wherein authority is vested by statute in the trial court or jury to recommend or determine as a part of its verdict or finding the punishment to be imposed, the court may modify such verdict or finding by imposing the lesser punishment without granting or ordering a new trial, and this power shall extend to any court to which the case may be appealed . . . ."

Section 1260 states: "The court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances."

contained in the Eighth Amendment, well as the corresponding provision in the California Constitution (Cal. Const., art. I, § 17).

In *Atkins v. Virginia* (2002) 536 U.S. 304 [153 L.Ed.2d 355, 122 S.Ct. 2242], the United States Supreme Court held that execution of the mentally retarded violates the Eighth Amendment. But *Atkins* did not give a precise definition of mental retardation, and it left to the states the task of creating procedures to determine whether individuals facing execution are mentally retarded. (536 U.S. at p. 317.) Thereafter, the California Legislature enacted section 1376, which establishes procedures for the determination of mental retardation in preconviction capital cases, and which defines mental retardation as "the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before the age of 18." (*Id.*, subd. (a).)

According to defendant, the evidence presented at trial shows that he is functionally indistinguishable from a mentally retarded offender. He points to testimony by defense experts that he has low intelligence, that he has an epileptic seizure disorder that has existed since he was a young child, and that this disorder has caused significant damage to his brain and will continue to do so in the future.

Defendant's argument appears to be based on this factual premise: (1) he has "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior" (§ 1376, subd. (a)); (2) this low functioning results from a condition that was "manifested before the age of 18" (*ibid.*); but (3) the condition *may not have* caused him to become retarded before he became 18 (*ibid.*). Thus, he argues, even if California's definition of mental retardation requires that the defendant's retardation occur before the age of 18 it would be unconstitutional to execute him merely because his retardation results from a condition that manifested itself before the age of 18 but did not cause him to become retarded until a later time.

There is no need to decide the *legal* issue defendant raises—whether the state and federal Constitutions prohibit the execution of a defendant who becomes retarded after age 18 as the result of a physical condition that existed before age 18—because the factual prerequisites underlying that issue have not been litigated. That is, the trial in this case did not determine the extent of defendant's current mental impairment, or when he became mentally impaired. As a result, those factual questions cannot be decided on this direct appeal; they can be determined only in a habeas corpus petition alleging, based on defendant's mental condition, that it would be unconstitutional to execute him. We therefore reject defendant's contention without prejudice to the filing of such a petition.

G. *Challenges to California's Death Penalty Law*

Defendant contends California's death penalty law violates the federal Constitution in many respects. We have in the past rejected all of these claims, and we reject his invitation to revisit them. Briefly:

(1) California's death penalty law adequately narrows the class of murderers eligible for the death penalty. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43 [45 Cal.Rptr.3d 407, 137 P.3d 229].)

(2) Factor (a) of section 190.3, which permits the jury to consider the "circumstances of the crime" in determining whether to impose the death penalty, is not unconstitutionally vague, arbitrary, or capricious. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–980 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Avila, supra*, 38 Cal.4th 491, 614.)

(3) The federal and state Constitutions as well as recent decisions of the United States Supreme Court do not require that the jury must apply a beyond a reasonable doubt standard when determining the truth of aggravating factors, that the jury may not impose the death penalty unless it finds beyond a reasonable doubt that the circumstances in aggravation outweigh those in mitigation, or that the jury must unanimously agree on the presence of a particular aggravating factor. (*People v. Boyer* (2006) 38 Cal.4th 412, 485 [42 Cal.Rptr.3d 677, 133 P.3d 581]; *People v. Blair* (2005) 36 Cal.4th 686, 753 [31 Cal.Rptr.3d 485, 115 P.3d 1145].)

(4) Neither the federal Constitution nor section 520 of the Evidence Code requires that the jury be instructed that the prosecution has the burden of proof with regard to the truth of aggravating circumstances or the appropriateness of the death penalty, and the trial court is not required to explicitly tell the jury that neither party bears the burden of proof. (*People v. Dunkle* (2005) 36 Cal.4th 861, 939 [32 Cal.Rptr.3d 23, 116 P.3d 494].)

(5) The federal Constitution does not require the jury to make written findings regarding aggravating factors. (*People v. Demetrulias, supra*, 39 Cal.4th at p. 43.)

(6) This court's refusal to conduct intercase proportionality review of a death sentence does not violate the federal Constitution. (*People v. Demetrulias, supra*, 39 Cal.4th at p. 44.)

(7) The adjectives "extreme" and "substantial" in statutory mitigating factors (d) and (g) of section 190.3 do not prevent the jury from considering mitigating evidence. (*People v. Boyer, supra*, 38 Cal.4th at p. 484.)

(8) The trial court is not required to instruct the jury that statutory factors (d), (e), (f), (g), (h), and (j) in section 190.3 are relevant only as mitigating factors, not as aggravating factors. (*People v. Gray* (2005) 37 Cal.4th 168, 236 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

(9) California's death penalty law does not violate the equal protection clause of the Fourteenth Amendment to the federal Constitution because the sentencing procedures for capital defendants are different from those for noncapital defendants. (*People v. Blair, supra*, 36 Cal.4th at p. 754.)

(10) California's use of the death penalty, which defendant alleges to be a "regular form of punishment," does not violate the Eighth and Fourteenth Amendments to the federal Constitution by violating what defendant describes as "international norms of humanity and decency," nor does it violate principles of international law. (See *People v. Blair, supra*, 36 Cal.4th at pp. 754–755.)

Defendant asserts that many of the claimed errors he has asserted violate the International Covenant on Civil and Political Rights, the American Declaration of the Rights and Duties of Man, the American Convention on Human Rights, the European Convention, and the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment adopted by the United Nations. Assuming for the sake of argument that these claims can be raised for the first time on appeal, and assuming for the sake of argument that these claims would, if meritorious, require reversal of defendant's murder convictions or sentence of death, the claims lack merit for the reasons we have discussed earlier. Defendant makes no showing that his rights under any of these agreements exceed those provided under California law.

 Finally, defendant appears to argue that under principles of international law he cannot be executed because he has become insane since being sentenced to death. We need not decide whether international law prohibits the execution of persons who have become insane, because execution of the insane is prohibited by the federal Constitution and by California law. (*Ford v. Wainwright* (1986) 477 U.S. 399 [91 L.Ed.2d 335, 106 S.Ct. 2595]; *People v. Kelly* (1992) 1 Cal.4th 495, 544 [3 Cal.Rptr.2d 677, 822 P.2d 385]; § 3700.5 et seq.) But the question whether a defendant is mentally competent to be executed is not determined until the defendant's execution date has been set. (§ 3700.5.) No date has been set for defendant's execution. Thus, his claim that he cannot be executed because he is insane is rejected as premature. (See *Kelly, supra*, at p. 545, fn. 11.)

## H. *Cumulative Error*

Defendant contends the cumulative impact of all of the errors at the guilt and penalty phases of trial require reversal of the judgment death. Considered cumulatively, the few errors we have identified do not require reversal.

### DISPOSITION

We affirm the judgment in its entirety.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied June 27, 2007.