Filed 3/27/25  P. v. Pinomi CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>SITANI PINOMI,<br><br>    Defendant and Appellant. | G062587<br><br>(Super. Ct. No. 21CF1473)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Lewis W. Clapp, Judge. Affirmed.

Benjamin Kington, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

While driving under the influence of alcohol and marijuana, Sitani Pinomi struck and killed 19-year-old Aden Alexander Uriostegui. A jury convicted Pinomi of several counts, including murder and driving under the influence causing great bodily injury. Pinomi contends the trial court erred by denying his motion to suppress statements he made at the scene of the collision. He argues those statements were made during a custodial interrogation before he was arrested and read his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

We affirm. The trial court did not err by denying Pinomi's motion to suppress his pre-arrest statements. Pinomi was not subject to a custodial interrogation before he was arrested, and the motion to suppress was properly denied.

FACTS

Just after 10:00 p.m. on May 19, 2021, Pinomi was driving "[v]ery fast" southbound on a street, at a speed of 60 to 70 miles an hour,[1] when he ran a red light and struck and killed pedestrian Uriostegui who was in the crosswalk.[2] Pinomi pulled over, got out of the truck, and ran toward Uriostegui to check his pulse but found none.

Pinomi looked up and saw a witness to the collision, standing nearby. Pinomi told the witness that the witness "didn't see who . . . was driving and who hit [Uriostegui]."

---

[1] The speed limit on this street is 40 miles per hour.

[2] Uriostegui's autopsy would later show Uriostegui died within seconds of impact from the blunt force injuries he suffered to the head and neck.

Emergency personnel were dispatched to the scene. During the ensuing police investigation of the collision, Pinomi told officers he drank gin at home earlier in the evening before going to a bar where he had five or seven drinks. He said he was driving home from the bar at the time of the collision. He stated he was driving "crazy" that night and estimated his driving at 60 miles per hour.

A blood draw at 1:09 a.m. showed Pinomi had a blood alcohol concentration of .103 percent. A forensic scientist provided expert testimony based on facts similar to those in the instant case. Specifically, the expert testified that if a 220 pound male with a blood alcohol concentration of .103 percent at 1:09 a.m. had starting drinking at 5:00 p.m., and continued drinking until about 10:08 p.m., that person would have had a .14 to .15 percent blood alcohol concentration at 10:08 p.m.

Tetrahydrocannabinol was also detected in Pinomi's blood sample which indicated he had used marijuana within the prior six hours. The expert opined the combination of alcohol and marijuana can produce a higher degree of impairment than the use of one substance alone.

Fourteen years earlier, in 2007, Pinomi was twice convicted of driving under the influence (DUI). At the time of his convictions he had been advised in court that "being under the influence of alcohol or drugs, or both, impairs his[] ability to safely operate a motor vehicle, and it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both." (Capitalization omitted.) Pinomi was further advised if he "continues to drive while under the influence of alcohol or drugs, or both, and as a result of his/her driving, someone is killed, [he] can be charged with murder." Pinomi indicated he understood each of these advisements at the

time. His driver's license was suspended as a result of his prior DUI convictions and remained suspended at the time of the collision.

Pinomi testified at trial he understood it is not safe to drink and drive and admitted he did drink and drive the night of the collision. He testified, however, that another vehicle had struck and killed Uriostegui, not the one he was driving.

PROCEDURAL HISTORY

Pinomi was charged in an amended information with the following felonies: (1) murder (Pen. Code, § 187); (2) driving under the influence of alcohol causing bodily injury (Veh. Code, § 23153, subd. (a)); (3) driving with blood alcohol concentration of .08 percent or more causing bodily injury (Veh. Code, § 23153, subd. (b)); and (4) driving under the influence of alcohol and drugs causing bodily injury (Veh. Code, § 23153, subd. (g)). Pinomi was also charged with one misdemeanor count for driving on a suspended license (Veh. Code, § 14601.2, subd. (a)). The amended information alleged, as to counts 2–4, pursuant to Penal Code section 12022.7, subdivision (a), and within the meaning of Penal Code sections 1192.7 and 667.5, Pinomi personally inflicted great bodily injury in the commission of those offenses.

The jury found Pinomi guilty on all counts as charged and found the enhancement allegations true. The trial court sentenced Pinomi to a total prison term of 15 years to life. Pinomi appealed.

DISCUSSION

Immediately after the fatal collision, the officer's contact and interview of Pinomi was video recorded through use of the officer's body-worn camera. The trial court denied Pinomi's motion to suppress Pinomi's pre-arrest statements. In addition to the officer's trial testimony regarding such

4

statements, the pre-arrest interview portion of the video recording was received into evidence and played for the jury.[3]

Pinomi's only contention on appeal is the trial court erred by failing to suppress his pre-arrest statements to law enforcement because they were elicited in the context of a custodial interrogation before he was read his rights under *Miranda*.[4] For the reasons we explain, based on the totality of the circumstances, we conclude Pinomi was not in custody within the meaning of *Miranda* when he made the statements at issue. The trial court, therefore, did not err by denying the motion to suppress Pinomi's pre-arrest statements.

## I.

### THE ON-SCENE INVESTIGATION

Mavrick Gaunt, a police officer for the City of Orange at the time of the collision, testified at the pretrial hearing on the motion to suppress Pinomi's pre-arrest statements. Gaunt testified that around 10:09 p.m. on May 19, 2021, he was dispatched to the intersection where the collision occurred. He was wearing a department-issued uniform that included a body-worn camera which recorded "a large portion of [his] contact with individuals

---

[3] The corresponding transcript of the video recording was also received into evidence.

[4] In his motion, Pinomi also moved to suppress his post-arrest/post-*Miranda* advisement statements. Pinomi does not challenge the trial court's denial of that portion of his motion in this appeal.

involved at that location."[5] We summarize Gaunt's testimony and the video recording of Pinomi's pre-arrest interview as follows.

Gaunt arrived at the scene minutes after the fatal collision occurred; multiple, as well as possible, witnesses were then present at the scene, as were members of the fire department and paramedics who had been attending to the then-deceased victim. After Gaunt arrived, but before he began questioning Pinomi, officers had Pinomi walk a short distance down the street and away from potential witnesses and from where the deceased victim still lay in the street; a majority of the interview took place at that location.

When Gaunt made contact with Pinomi, Gaunt believed Pinomi had been involved in the collision at that intersection, and so Gaunt began his investigation into "a possible DUI and a fatality." The video recording shows Gaunt introduced himself to Pinomi and stated: "I'm just one of the traffic investigat[or]s so I'm just here trying to figure out what's going on, alright?" After Pinomi said "yes," Gaunt asked "what was going on Stan what happened tonight?" Pinomi responded that he had been drinking. Gaunt could smell the odor of an alcoholic beverage emitting from Pinomi. Pinomi also slurred his speech and made statements referencing his alcohol consumption. When Gaunt asked Pinomi to describe his level of intoxication, Pinomi said, "I'm fucked up."

Shortly after making contact, Gaunt told Pinomi he was not under arrest but was detained because Gaunt was "piecing stuff together

[5] As relevant to the issue presented in this appeal, the admitted body worn camera video only showed footage beginning when Gaunt arrived at the scene of the collision and ended when Pinomi was arrested.

kinda figuring out what happened." Three other uniformed officers stood in the general vicinity as Pinomi was seated on the curb of the commercial street lined by gas stations and restaurants.

Gaunt asked Pinomi to submit to field sobriety tests. Pinomi agreed; he answered Gaunt's questions and attempted to perform those tests. During the investigation, Pinomi requested he be treated by the emergency personnel who were on the scene. Gaunt stepped away while the paramedics assessed Pinomi and eventually cleared him several minutes later.

When Gaunt resumed his interview of Pinomi, Pinomi stated he was drunk, had been driving "crazy," and was driving the truck during the collision. He also admitted he had a prior DUI. After attempting further field sobriety tests, Gaunt asked Pinomi to voluntarily submit to a preliminary alcohol screening test to which Pinomi consented.

Gaunt's entire contact with Pinomi at the scene took place outside on the street near where the collision had occurred. Pinomi was cooperative and tried to follow the directions he was given. No officer pulled out any weapon and no threats were made against Pinomi. At the end of Gaunt's on-scene investigation, Pinomi was handcuffed, placed under arrest, and put into a patrol car. He was subsequently transported to the police department where his blood was drawn and his *Miranda* rights advisement was given.

Following Gaunt's testimony, review of the video recording of the pre-arrest interview, and counsel's argument, the trial court denied the motion in limine to exclude Pinomi's pre-arrest statements.

7

## II.

### *MIRANDA, SUPRA*, 384 U.S. 436

Before any custodial interrogation, suspects must be told they have a right to remain silent, anything they say may be used as evidence against them in court, and they are entitled to the presence of an attorney, either retained or appointed, at the interrogation. (*Miranda, supra*, 384 U.S. at p. 444; *Thompson v. Keohane* (1995) 516 U.S. 99, 107.) "An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citation.] Whether a person is in custody is an objective test; the pertinent inquiry is whether there was ""a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest."""" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

"All objective circumstances of the interrogation are relevant to this inquiry, including the site of the interrogation, the length and form of questioning, and whether the officers have conveyed to the subject that their investigation has focused on him or her." (*People v. Caro* (2019) 7 Cal.5th 463, 491–492.) Factors additionally relevant to this determination include the ratio of police officers to suspects, whether the suspect was told he or she could terminate the questioning, the demeanor of the officers and whether they dominated or controlled the interrogation or were aggressive, confrontational, or accusatory, whether the officers pressured the suspect, whether the suspect was arrested at the end of the interrogation, and whether the suspect's freedom of movement was restricted during the interrogation. (*People v. Bejasa* (2012) 205 Cal.App.4th 26, 35–36.)

However, even in instances where one's freedom of movement is curtailed, the question becomes "'whether the relevant environment presents the same inherently coercive pressures as the type of station house

questioning at issue in *Miranda*.'" (*People v. Caro, supra*, 7 Cal.5th at p. 491.) The determination of whether a defendant is in custody at the time of questioning is objective and therefore "does not depend on 'the subjective views harbored by either the interrogating officers or the person being questioned.'" (*Id.* at pp. 491–492.)

On review, "[w]e independently evaluate whether the defendant was in custody by considering the totality of the circumstances surrounding the incident. [Citation.] No single factor is dispositive. [Citation.] 'Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest.' [Citation.] Where, as here, an interview is recorded, the facts surrounding the admission are undisputed and subject to our independent review." (*People v. Torres* (2018) 25 Cal.App.5th 162, 173.)

III.

PINOMI WAS NOT IN CUSTODY BEFORE HE WAS ARRESTED

The facts relevant to the determination of whether Pinomi was in custody for purposes of *Miranda* before he was arrested are undisputed. We conclude, after considering the totality of the relevant circumstances, Pinomi was not in custody before his formal arrest.

The evidence established Pinomi had been subject to the equivalent of an investigation subsequent to a traffic stop. Police officers arrived at the scene of the fatal collision involving a truck with significant front-end damage and a pedestrian, who was declared deceased minutes after it occurred.

An immediate investigation was appropriate and necessary. The investigating officers observed Pinomi at the scene. He had an odor of alcohol,

9

an unsteady gait, and his speech was slurred. Pinomi was asked a series of standardized questions to help confirm or dispel suspicions he was intoxicated. "'When circumstances demand immediate investigation by the police, the most useful, most available tool for such investigation is general on-the-scene questioning, designed to bring out the person's explanation . . . and enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.'" (*People v. Davidson* (2013) 221 Cal.App.4th 966, 968.) Because the determination of whether a defendant is in custody "depends on the objective circumstances of the interrogation, not the subjective views harbored by either the interrogating officers or the person being questioned," Gaunt's suspicion Pinomi may have been driving under the influence of alcohol is not pertinent. (*Stansbury v. California* (1994) 511 U.S. 318, 323.)

The pre-arrest investigation was about one hour long, which was no longer than necessary given the circumstances. (*People v. Tully* (2012) 54 Cal.4th 952, 980 ["'[T]he law contemplates that the officer may temporarily detain the offender at the scene for the period of time necessary to discharge the duties that he incurs by virtue of the traffic stop'"].) Here, part of the time reflected on the pre-arrest video recording showed paramedics assessing Pinomi for injury and Gaunt speaking to witnesses and other officers, during which time Gaunt ceased questioning Pinomi and stepped away. (See *People v. Forster* (1994) 29 Cal.App.4th 1746, 1753–1754 [detention of more than one hour did not establish the defendant was in custody because the length was "rationally explainable"].)

The entire pre-arrest interview took place out in the open on a commercial street near the site of the collision. (See *Berkemer v. McCarty* (1984) 468 U.S. 420, 438, fn. omitted [addressing the significance of the

10

public nature of a typical traffic stop, observed "[p]assersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse"].) The video recording shows the presence of firefighters, paramedics, witnesses, and bystanders in the area.

Toward the beginning of the interview, Gaunt told Pinomi he was not under arrest but only detained for purposes of investigating the collision. During some of the field sobriety tests, Pinomi moved freely in the street as he tried to follow Gaunt's instructions. He was never told he was not free to leave. No officer ever told Pinomi before his arrest that his detention would be anything other than temporary. (See *Berkemer, supra*, 468 U.S. at pp. 441–442.)

The video recording showed the officers did not dominate the investigation. Although there were additional officers in the area with Pinomi, no officer was aggressive, confrontational, or accusatory. The video recording also shows Pinomi was cooperative; he offered officers fist bumps and occasionally told them he loved them.

Pinomi was primarily questioned by Gaunt but a second officer, Officer Martin Suarez, also questioned Pinomi. Gaunt and Suarez asked Pinomi if he had any questions.

Pinomi was never told he had to answer any questions, participate in the field sobriety tests, or take a breathalyzer test, and he was not otherwise forced or coerced to comply in any such respect. In the middle of the interview, Gaunt told Pinomi he had more questions and asked Pinomi

11

to "bear with [him], alright?" Pinomi responded: "Yeah. Bring all the questions." Pinomi was never handcuffed until he was formally arrested.

Based on the totality of the circumstances here we agree with the trial court Pinomi's pre-arrest statements were admissible. These statements were not the product of a custodial interrogation warranting the *Miranda* advisement. The trial court therefore did not err by denying Pinomi's motion to suppress his pre-arrest statements.

## DISPOSITION

The judgment is affirmed.

MOTOIKE, J.

WE CONCUR:

O'LEARY, P. J.

MOORE, J.

12